APPEL, Justice
(concurring in part and dissenting in part).
I respectfully concur in part and dissent in part from the majority/plurality opinion. In my view, only the instruction related to material adverse action in connection with plaintiffs retaliation claim is flawed. I find the district court properly instructed the jury on all other issues in this case.
I. Factual and Procedural Background.
Homeland Energy Solutions, LLC (HES) is an ethanol processing facility in Lawler, Iowa, where it opened in February 2009. Tina Haskenhoff began work at HES *605 as a’lab manager immediately upon its opening.
Kevin Howes was Haskenhoffs supervisor. Howes, along with several of Hasken-hoffs coworkers, repeatedly made demeaning sexual comments to Haskenhoff and engaged in other offensive behavior. This included Howes frequently commenting on Haskenhoffs breasts in front of Haskenhoff and with other HES employees.
In November 2010, Haskenhoff informed Howes that she would be absent from a meeting for a medical appointment. Howes asked about the reason for the appointment and, upon learning that it was for a mammogram, told Haskenhoff that she should have the breast exam in the parking lot in order to earn some money.
Later that week, Haskenhoff told Chad Kuhlers about the offensive behavior. Kuh-lers was on the board of directors for HES. Kuhlers immediately reported this information to HES’s president and CEO Walter Wendland and to human resource manager Sarah Frein.
Howes learned that Haskenhoff had complained about him, and he met with Haskenhoff to ask that she drop the complaint. Howes said that he was worried he was going to be fired. Wendland also met with Haskenhoff about the complaint, stating the employees of HES were “like family.” Haskenhoff reported later that she found Howes’s and Wendland’s behaviors intimidating, and she feared the consequences to her employment if she continued with the complaint. Haskenhoff agreed to drop the complaint on the assumption that Howes’s behavior would change.
The sexually offensive behavior, however, continued. Finally, on August 8, 2011, Haskenhoff overheard Howes tell another employee that'Haskenhoff was marrying her fiancé for the money. This comment upset Haskenhoff who told a coworker that Howes was' “a fucking asshole.” Hasken-hoff left work in the middle of the day and sent an email to Howes complaining about his comment.
On August 17, Haskenhoff filed a sexual-harassment complaint against Howes with Fréin. Several meetings occurred between the participants thereafter. Finally, on August 30, Haskenhoff was asked to meet with Wendland, David Finke—the CFO and head of human resources—and Howes. At this meeting, Haskenhoffs sexual-harassment complaint was discussed. Additionally, Howes presented' Haskenhoff with a ninety-day “performance improvement plan” for using vulgar language when referring to Howes and walking off the job on August 8. The plan noted, “Failure to adhere to these expectations/conditions will result in further disciplinary action up to termination.”
Haskenhoff later said that after the August 30 meeting, she realized HES would take no effective action against Howes and that if she continued to complain about the harassment she would be fired. On August 31, Haskenhoff confronted Finke and accused him of letting Howes get'away with the harassment and permitting Howes to retaliate against her. Haskenhoff resigned.
On May 21, 2012, Haskenhoff brought charges of employment discrimination at the Iowa Civil Rights Commission. The commission gave Haskenhoff a release to bring suit, after which she brought suit in district court for sexual harassment and retaliation under the Iowa Civil Rights Act (ICRA). The jury found in favor of Hask-enhoff and awarded her damages. HES appealed, and we retained the appeal.
II. Relationship Between State and Federal Civil Rights Statutes.
A. Introduction. Before analyzing the substantive issues in this case, it is impor *606 tant to stress that the ICRA is not simply a knockoff of the Federal Civil Rights Act. We have sometimes loosely said that the ICRA was “modeled after” or mirrors Title VII. See, e.g., Estate of Harris v. Papa John’s Pizza, 679 N.W.2d 673, 677-78 (Iowa 2004); Pecenka v. Fareway Stores, Inc., 672 N.W.2d 800, 803 (Iowa 2003). These observations have validity only in the most general sense, can be materially misleading, and in any case do not provide meaningful guidance in the resolution of any concrete controversy under the ICRA.
First, the modeled-after or mirror theory generally overlooks the fact that the ICRA, as well as Title VII, were preceded by more than twenty state statutes. See Andrea Catania, State Employment Discrimination Remedies and Pendent Jurisdiction Under Title VII: Access to Federal Courts, 32 Am. U. L. Rev. 777, 782 n.24 (1983) [hereinafter Catania], Beginning in the 1940s, states passed civil rights statutes that included many of the features now embraced in Title VII. Alex Elson & Leonard Schanfield, Local Regulation of Discriminatory Employment Practices, 56 Yale L.J. 431, 434 (1947). There is a rich body of commentary on these state laws that seems to have been overlooked in our cases suggesting that the ICRA mirrors or is modeled after Title VII.[19]
In fact, both the ICRA and Title VII drew from this preexisting body of state law. See Pippen v. State, 854 N.W.2d 1, 30 (Iowa 2014). In an article that appeared in the Iowa Law Review in the year that the ICRA was passed, Professor Arthur Bon-field, a leading proponent of the legislation, cited the experience in other states in support of the legislation. Arthur Earl Bonfield, State Civil Rights Statutes: Some Proposals, 49 Iowa L. Rev. 1067, 1082 & n.65 (1964).
Thus, the ICRA and Title VII both mirrored and were modeled after preexisting state law in the same general sense that the ICRA is modeled after or mirrors federal law. For example, the “because of’ causation language in the ICRA and Title VII, which is at the heart of one of the issues in this litigation, was used in state civil rights statutes that predate them.[20] Similarly, retaliation provisions in state civil rights laws predated the retaliation provision in the ICRA and Title VII. See, e.g., Wash. Rev. Code § 49.60.200 (1957); *607 Wis. Stat. § 111.32(5)(b)(3) (1961); Morroe Berger, New York State Law Against Discrimination: Operation and Administration, 35 Cornell L. Rev. 747, 751 (1950) (describing the contents of New York’s 1945 law). In this case, the relevant provisions of the ICRA and Title VII are, as a matter of historical fact, modeled after or mirror preexisting state law. Alex Long, State Anti-Discrimination Law as Model for Amending the Americans with Disabilities Act, 65 U. Pitt. L. Rev. 597, 600 (2004) (stating “Congress modeled Title VII ... on existing state anti-discrimination laws”).
Second, the modeled-after or mirrors theory particularly overlooks the fact that Iowa had a preexisting civil rights statute before Title VII was enacted. Iowa’s first civil rights act was enacted in 1883 shortly after the United States Supreme Court, in an appalling decision corrected only decades later, held that a key portion of the Federal Civil Rights Act of 1871—prohibit-ing discrimination by private persons—was unconstitutional. See United States v. Harris, 106 U.S. 629, 644, 1 S.Ct. 601, 613, 27 L.Ed. 290 (1883), abrogated by Griffin v. Breckenridge, 403 U.S. 88, 104, 91 S.Ct. 1790, 1799, 29 L.Ed.2d 338 (1971). Then, in 1963, fully a year prior to the enactment of Title VII, Iowa joined twenty-six states in enacting a statute prohibiting discrimination in employment. That statute declared it unlawful “for any person or employer to discriminate in the employment of individuals because of race, religion, color, national origin, or ancestry.” 1963 Iowa Acts ch. 330, § 1 (codified at Iowa Code § 105A.7 (1966)). Thus, the because-of causation language that later appeared in the ICRA was based on language in an Iowa statute that predated Title VII which was modeled after civil rights legislation in other states. It is simply wrong to suggest that the because-of language in the ICRA was modeled after Title VII. A more accurate statement would be that the because-of language in Title VII was modeled after state law precedents, including the ICRA of 1963.
Third, while the texts of the two statutes are sometimes similar, they are often quite dissimilar. There are material differences between the two statutes in scope, structure, and remedy. Thus, a generalized statement that the ICRA is modeled on, similar to, or mirrors Title VII even from a textual viewpoint is often not true.[21] Further, as will be shown below, the legislative history behind Title VII is often quite distinctive and plainly inapplicable to any construction of the ICRA. Instead of employing a generalized and often inaccurate slogan, in interpreting the ICRA we must engage in serious, provision-by-provision analysis, recognizing similarities when they appear, but also honoring the differences.
B. Legislative Direction that the ICRA “Shall Be Construed Broadly to Meet Its Purposes.” As all judges, lawyers, and litigants know, the ICRA has many ambiguities and gaps which courts are called upon to resolve and fill in the context of adversarial litigation. While the *608 Iowa legislature has advanced a statute with ambiguities and gaps, it has provided courts with an instruction on how to approach it. Specifically, the legislature has directed that the ICRA “shall be construed broadly to effectuate its purposes.” Iowa Code § 216.18(1) (2011). As we pointed out in Pippen, there is no comparable language in the federal statute. 854 N.W.2d at 28. Iowa Code section 216,18(1) is an example of a provision of the ICRA that is not modeled after and does not mirror Title VII.
Our better reasoned cases show that this marked textual difference is consequential. In Pippen, we pointed out that a number of other state supreme courts have construed similar statutory language in civil rights acts to require the “widest constitutional application.” Id. (quoting Fair Emp’t Practices. Comm’n v. Rush-Presbyterian-St. Luke’s Med. Ctr., 41 Ill.App.3d 712, 854 N.E.2d 596, 600 (1976) (holding that a wide application was required given the legislative intent for the remedial provisions of the act)); see also Wondzell v. Alaska Wood Prods., Inc., 601 P.2d 584, 585 (Alaska 1979) (finding Alaska civil rights act not simply modeled after federal law, but “intended to be more broadly interpreted than federal law to further the goal of eradication of discrimination ... [as shown by the] legislature’s intent ‘to put as many “teeth” into the statute as possible’ ” (quoting McLean v. State, 583 P.2d 867, 869 (Alaska 1978) (citations omitted))); Marquis v. City of Spokane, 130 Wash.2d 97, 922 P.2d 43, 49-50 (1996) (en banc) (explicitly recognizing legislative directive to construe Washington civil rights statute liberally); Allison v. Hous. Auth. of Seattle, 118 Wash.2d 79, 821 P.2d 34, 38 (1991) (en banc) (“Title VII differs from [Washington civil rights law] in that Title VII does not contain a provision which requires liberal construction for the accomplishment of its purposes.”); Lodis v. Corbis Holdings, Inc., 172 Wash.App. 835, 292 P.3d 779, 787 (2013) (Adopting federal precedent would “impermissibly narrow the protective language and purposes of [Washington’s civil rights law], contrary to the liberal construction mandate of the act.”).
A few state civil rights statutes passed prior to the ICRA also contained provisions directing courts to construe the statute broadly. See, e.g., Del. Code Ann. tit. 6, § 4502 (1963) (“This chapter shall be liberally construed to the end that the rights herein provided for all people without regard to race, creed, color or national origin may be effectively safeguarded.”); Wash. Rev. Code § 49.60.020 (1957) (“The provisions of this chapter shall be construed liberally for the accomplishment of the purposes thereof.”); W. Va. Code § 5-11-265(161) (1961) (“The provisions of this article shall be liberally construed to accomplish its- objectives and purposes.”); Wis. Stat. § 111.31 (1961) (“All the provisions of this subchapter shall be liberally construed for the accomplishment of this purpose.”).
Plainly, a narrow construction of the ICRA would be in defiance of the legislative mandate to broadly construe the statute to effectuate its purposes and would amount to a judicial recrafting of the statute. As we stated in Pippen, an Iowa court “must keep in mind the legislative direction of broadly interpreting the Act when choosing among plausible legal alternatives.” 854 N.W.2d at 28.
■ The legislative direction that we broadly interpret the ICRA makes federal authority that chooses narrow constructions among, available options suspect. Federal courts, and particularly the United States Supreme Court, have demonstrated a marked tendency to embrace a narrow construction of federal civil rights statutes in the face of more generous plausible *609 alternatives. As a result, Congress has repeatedly overridden by statute narrow interpretations of federal civil rights laws. Seven important United States Supreme Court civil lights cases overridden by Congress include General Electric Co. v. Gilbert, 429 U.S. 125, 134, 97 S.Ct. 401, 407, 50 L.Ed.2d 343 (1976) (holding discrimination based on pregnancy was not sex discrimination), superseded by statute,- Pregnancy Discrimination Act of 1978, Pub. L. No. 95-555, 92 Stat. 2016 (codified as amended at 42 U.S.C. § 2000e(k) (2012)); Price Waterhouse v. Hopkins, 490 U.S. 228, 239-40, 109 S.Ct. 1775, 1785, 104 L.Ed.2d 268 (1989) (interpreting “because of’ in the context of discrimination), superseded by statute, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (codified as amended at 42 U.S.C. § 2002e-2(m)); Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 656-57, 109 S.Ct. 2115, 2124-25, 104 L.Ed.2d 733 (1989) (requiring proof of discriminatory intent in disparate impact cases), superseded by statute, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (codified as amended at 42 U.S.C. § 2000e-2(k)); Patterson V. McLean Credit Union, 491 U.S. 164, 176-77, 109 S.Ct. 2363, 2372, 105 L.Ed.2d 132 (1989) (holding that conduct occurring after the formation of an employment contract could not be racial discrimination under § 1981), superseded by statute, Civil Rights . Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (codified as amended at 42 U.S.C. § 1981(b)); Sutton v. United Airlines, Inc., 527 U.S. 471, 478, 119 S.Ct. 2139, 2144, 144 L.Ed.2d 450 (1999) (announcing a restrictive interpretation of “impairment” and “disability” under the ADA), superseded by statute, ADA Amendment Act of 2008, Pub. L. No. 110-325, 112 Stat. 3553 (codified as amended at 42 U.S.C. § 12102(3)); Toyota Motor Mfg. of Ky., Inc. v. Williams, 534 U.S. 184, 195, 122 S.Ct. 681, 690, 151 L.Ed.2d 615 (2002) (narrowing scope of protection under the ADA), superseded by statute, ADA Amendment Act of 2008, Pub. L. No. 110-325,112 Stat. 3553 (codified as amended at 42 U.S.C, § 12102(3)); and Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 621, 127 S.Ct. 2162, 2165, 167 L.Ed.2d 982 (2007) (holding statute of limitations for discriminatory pay practices begins when initial pay decision was made), superseded by statute, Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5 (codified as amended at 42 U.S.C. § 2000e-5(e)(3)). See, e.g.,. Sandra F. Sperino, Diminishing Deference: Learning Lessons from Recent Congressional Rejection of the Supreme Court’s Interpretation of Discrimination Statutes, 33 Rutgers L. Rec. 40, 40 (2009) (stating “blind adherence to federal interpretation of discrimination principles on state employment discrimination claims is not only often inappropriate, but also has seriously impacted the development of employment discrimination law”); Sandra F. Sperino, Revitalizing State Employment Discrimination Law, 20 Geo. Mason L. Rev. 545, 583 (2013) [hereinafter Sperino, Revitalizing] (“[T]he federal courts have repeatedly interpreted federal law narrowly in ways that drew a response from Congress.”). Uncritical incorporation of the principles of these now superseded cases under the ICRA would run counter to the Iowa legislature’s directive that the ICRA be “broadly interpreted to effectuate its purposes.” Iowa Code § 216.18(1); see also Goodpaster v. Schwan’s Home Servs., Inc., 849 N.W.2d 1, 9-10 (Iowa 2014).
And these are only the cases that Congress managed to override. Whenever a highly divided United ■ States Supreme Court chooses a narrow interpretive path under federal civil rights statutes, we must consider whether the dissenting opinion is more consistent with the legislative di *610 rection that the ICRA be broadly interpreted to achieve its goals.[22]
The directive to construe the ICRA broadly has had impact. For instance, in Goodpaster, we considered whether an intermittent or episodic impairment—multiple sclerosis—fell within the definition of “disability” under the ICRA. 849 N.W.2d at 6. We emphasized section 216.8(1)⅛ instruction to interpret the ICRA broadly in reaching the result that multiple sclerosis could be a disability under the ICRA. Id. at 9-10, 18. We noted that this difference with federal law rendered many federal cases inapposite in interpreting the ICRA. Id. at 10. We cited several of our cases in which section 216.18(1) had a “substantive impact on the outcome.” Id.; see, e.g., Polk Cty. Secondary Rds. v. Iowa Civil Rights Comm’n, 468 N.W.2d 811, 815-16 (Iowa 1991).
In construing a provision of the ICRA, the legislative direction to broadly construe the statute to effectuate its purposes must be recognized. To ignore this provision is to rewrite the statute to achieve desired policy results.
C. Textual Differences Between the ICRA and Federal Civil Rights Statutes. When there are textual differences between the ICRA and federal civil rights statutes, we must be attentive to those differences. When there are textual differences, the modeled-after or mirror declarations have no application, and indeed an opposite conclusion may be more appropriate, namely, that differences in text are deliberate and substantive.
A good example of the need to recognize textual differences between the ICRA and federal civil rights law is Hulme v. Barrett (Hulme I), 449 N.W.2d 629 (1989). In Hulme I, we considered whether the provision of the Federal Age Discrimination in Employment Act (ADEA) of 1967 limiting coverage to those forty years of age or older applied under the ICRA. Id. at 631. The district court, apparently following a version of the modeled-after or mirror theory, held that the limitation in the Federal ADEA also applied under the ICRA. Id. at 631.
We reversed. Id. at 632. We noted that while the federal statute had language explicitly limiting claims to persons above the age of forty, the ICRA had no such textual limitation. Id. at 631-32. In Hulme I, we correctly declined to follow federal precedent because the text of our statute was not modeled after and did not mirror federal law. As will be seen below, there *611 are important textual and legislative history differences between the ICRA and Title VII as it relates to the causation element in retaliation claims.
D. Structural Differences Between the ICRA and Federal Civil Rights Statutes. As pointed out in Pippen, there is also an important structural difference between the ICRA and various civil rights statutes. See 854 N.W.2d at 28. The ICRA is a unified statute. In contrast,'the federal civil rights regime is more fragmented. See Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623; Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (Title VII); American with Disabilities Act of 1990, 42 U.S.C. § 12112. Thus, while the federal courts have developed different tests for different causes of action under different statutes, the Iowa statute generally calls out for a singular, unified approach. See, e.g., Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176-78, 129 S.Ct. 2343, 2350-51, 174 L.Ed.2d 119 (2009) (holding that Title VII and ADEA causation standards are different). It would be very difficult to come to the same conclusion under the ICRA, a unified statute with one statutory provision establishing what constitutes status-based discrimination. The fractured nature of federal law compared to the unified approach of the ICRA makes wholesale importation of federal law questionable. See Sperino, Revitalizing, 20 Geo. Mason L. Rev. at 560 (contrasting unified state regimes with fractured federal law).
E. Interpretation of Gaps and Ambiguous Phrases. Civil rights statutes contain many notoriously open-ended or ambiguous phrases that cry out for interpretation. For ambiguous phrases, there is rarely only one plausible interpretation. See Hack v. President & Fellows of Yale Coll., 237 F.3d 81, 95 (2d Cir. 2000) (“The Act’s ambiguous language ... has allowed a number of contradictory standards to emerge.”). For example, the phrase “because of’ sex, race, and other classifications has given rise to a wide number of potential interpretations. See David S. Schwartz, When Is Sex Because of Sex? The Causation Problem in Sexual Harassment Law, 150 U. Pa. L. Rev. 1697, 1708-09 (2002) [hereinafter Schwartz] (noting different approaches to ambiguous terms). There is simply no requirement that in construing ambiguous phrases we should follow the lead of the United States Supreme Court rather than that of another state court or where our own judgment would lead us.
Further, many legal structures developed by the United States Supreme Court are not found in the statutory text of Title VII and have been fashioned by the Supreme Court based on its policy perceptions. For example, the requirement that harassment be “pervasive and severe” in order to amount to actionable discrimination does not appear in the text of Title VII. See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405-06, 91 L.Ed.2d 49 (1986). It is a judicial construct created by the United States Supreme Court. The complex architecture surrounding disparate impact also has no clear textual foundation. Cf. Wards Cove, 490 U.S. at 656-58, 109 S.Ct. at 2124-25; Watson v. Ft. Worth Bank & Tr., 487 U.S. 977, 986-89, 108 S.Ct. 2777, 2784-86, 101 L.Ed.2d 827 (1988); Griggs v. Duke Power Co., 401 U.S. 424, 431-32, 91 S.Ct. 849, 853-54, 28 L.Ed.2d 158 (1970). The burden-shifting approach to causation found in various United States Supreme Court cases is without explicit textual support. See Desert Palace, Inc. v. Costa, 539 U.S. 90, 93-94, 123 S.Ct. 2148, 2150-51, 156 L.Ed.2d 84 (2003); Price Waterhouse, 490 U.S. at 244-45, 109 S.Ct. at 1787-88; McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The notion that an *612 “adverse action” is required to support a retaliation claim is not mentioned in Title VIL Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 56-57, 126 S.Ct. 2405, 2408-09, 165 L.Ed.2d 345 (2006). And, the Faragher-Ellerth defense developed by the Supreme Court for cases involving vicarious liability of supervisors when there is no tangible adverse employment action has no explicit textual support in Title VII, but was crafted primarily as a result of the policy considerations of the Court. See Faragher v. City of Boca Raton, 524 U.S. 775, 804-05, 118 S.Ct. 2275, 2291-92, 141 L.Ed.2d 662 (1998); Burlington Indus., Inc. v. Ellerth, 524.U.S. 742, 765, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998).
These judicially developed constructs are not textually guided, but instead reflect the views of a majority of the United States Supreme Court on the subject of discrimination. If one believes, for example, that discrimination in the workplace is a relatively rare occurrence, the development of demanding judicial standards through interpretation or construction may seem to make sense. On the other hand, if one believes that discrimination is widespread and intractable, a different result might occur. Sperino, Revitalizing, 20 Geo. Mason L. Rev. at 575-77.
Because of the lack of textual support, it is not surprising that a number of courts have declined to create a Faragher-Ellerth defense for cases involving vicarious liability under state civil rights acts. See, e.g., Myrick v. GTE Main St. Inc., 73 F.Supp.2d 94, 98 (D. Mass. 1999) (declining to apply Faragher-Ellerth defense on state law grounds); Chambers v. Trettco, Inc., 463 Mich. 297, 614 N.W.2d 910, 918 (2000) (rejecting Faragher-Ellerth under Michigan law); Pollock v. Wetterau Food Distribution Grp., 11 S.W.3d 754, 767 (Mo. Ct. App. 1999) (refusing to add words to Missouri, human rights statute to establish a Faragher-Ellerth defense).
In making choices regarding ambiguous phrases and determining whether and how to All legislative gaps, Iowa courts are free to depart from what are often very narrow and cramped approaches of federal law.[23] For example, in Goodpaster, we rejected United States Supreme Court precedent that, contrary to the ICRA, declared the Americans with Disabilities Act must be “interpreted strictly to create a demanding standard for qualifying as disabled.” 849 N.W.2d at 10 (quoting Toyota, 534 U.S. at 197, 122 S.Ct. at 691); see Sutton, 527 U.S. at 488, 119 S.Ct. at 2149. The Supreme Court’s determination to strictly interpret the statute flies in the face of the Iowa legislature’s direction to construe the statute broadly. See Iowa Code § 216.180.).[24]
Thus, in order to choose the best interpretive option on a statutory issue under the ICRA, it is not enough to simply cut and paste a version of federal law into the Northwest Reporter and call it a day.[25] We *613 do not follow federal constitutional interpretations lockstep, even of parallel provisions, and there is no reason to follow federal statutory interpretation in a lockstep fashion in similar statutes.[26] Instead, *614 consistent with preservation principles,[27] we must first identify potential interpretive options that are available to the court. Ordinarily, this involves a survey of state as well as federal law. Once the potential alternative approaches are identified, we should proceed to select the interpretive option that we find most consistent with the ICRA, its underlying purposes, and the legislative direction that the text be “broadly construed to effectuate its purposes.” Iowa Code § 216.18(1). We may, of course, rely on persuasive federal precedents, especially when the language of Title VII and the ICRA are, in fact, similar, the federal interpretation is consistent with the legislature’s directive of broad interpretation, and the rationale of the federal caselaw persuades us that the best choice has been made. But we must look for persuasive reasoning that fits the Iowa statute. And, we should not mask our policy choices in resolving ambiguities and filling statutory gaps through language suggesting that the choice was somehow inexorable or determined with a mathematical certainty that may be found in the scientific world but evades the law. We are in the business of judging, not calculating.
F. Independent Interpretation of ICRA Consistent with Federalism and Congressional Intent Behind Title VII. When Congress enacted Title VII, approximately one-half' of the states had civil rights statutes already. Catania, 32 Am. U. L. Rev. at 782 n.24. Congress expressly determined not to preempt state law. 42 U.S.C. § 2000h-4. As noted by the United States Supreme Court, Congress intended Title VII “to supplement, rather than supplant, existing laws and institutions related to employment discrimination.” See Alexander v. Gardner-Denver Co., 415 U.S. 36, 47-48, 94 S.Ct. 1011, 1019-20, 39 L.Ed.2d 147 (1974) (finding legislative history showed clear congressional intent to allow an individual to pursue state law remedies simultaneously with Title VII). Congress plainly did not intend to preempt state civil rights laws. Id. As noted by Professor Bonfield, “the federal act ... recognizes the continued effectiveness of state fair employment laws and provides that they will retain a vital and perhaps dominant role in this area.” Arthur E. Bonfield, The Substance of American Fair Employment Practices Legislation I: Employers, 61 Nw. U. L. Rev. 907, 919 (1967).
A conclusion that state courts should generally follow the twists and turns in federal law would be ironic in light of the congressional intent to allow, if not encourage, state experimentation.
G. A Note on Law of the Case, Stare Decisis, and Dictum. If one looks through our ICRA cases, federal cases are often simply cited for propositions of law without substantive discussion. Often times in this setting, we were simply restating legal principles that the parties were not contesting in the case. When a legal principle is embraced by the parties by agreement and is not contested on appeal, the court’s subsequent recitation of the legal principle is not a holding in the case that was a product of an adversary proceeding. See Berger v. Gen. United Grp., Inc., 268 N.W.2d 630, 635 (Iowa 1978) (holding that because plaintiffs assumed Delaware law was properly pled and proven by defendants, we would consider Delaware law, but stressed that this case was not precedent for ignoring our rules of pleading and proof on foreign law); see also United States v. Hemingway, 734 F.3d 323, 335 (4th Cir. 2013) (finding a prior case to have no precedential value on a question because the issue was not contested in the earlier case); Goldberger v. Integrated *615 Res., Inc., 209 F.3d 43, 49 (2d Cir. 2000) (earlier case was not precedent because “that issue was neither contested by the parties, nor addressed by the panel”); Fulton Found. v. Wis. Dep’t of Taxation, 13 Wis.2d 1, 108 N.W.2d 312, 316-17 (1961) (holding previous case when no one challenged the issue could not be precedent on the issue); Silver Lake Sanitary Dist. v. Wis. Dep’t of Nat. Res., 232 Wis.2d 217, 607 N.W.2d 50, 54 (Wis. Ct. App. 1999) (“It is blackletter law that an opinion does not establish binding precedent for an issue, if that issue was neither contested nor decided.”).
An uncoritested statement of law is not entitled to stare decisis. See, e.g., Hemingway, 734 F.3d at 335; Goldberger, 209 F.3d at 49; Berger, 268 N.W.2d at 635; Fulton, 108 N.W.2d at 317. Instead, the agreed upon legal principle is law of the case binding on the parties in the event of retrial, but nothing more. State v. Ragland, 812 N.W.2d 654, 658 (Iowa 2012) (holding settled legal principles are binding on litigants throughout future progress of case); accord State ex rel. Goettsch v. Diacide Distribs., Inc., 596 N.W.2d 532, 537 (Iowa 1999).
III. Negligence Theory, Vicarious Liability, and the Faragher-El-lerth Defense.
A. Overview of the Issue. When an employee is sexually harassed by other employees, the question arises to what extent the employer may be held responsible for the actions of its employees under civil rights laws. One question is whether it should matter that the harassment was committed by a coworker or by a supervisor. If the harassment is by a supervisor, should the supervisor be considered an agent of the employer and thus provide a basis for vicarious liability? If different legal consequences flow from harassment involving a supervisor compared to harassment by coworkers, how does the law handle situations when harassers include both coworkers and supervisors?
As with many similar issues, nothing in the ICRA or Title VII expressly answers these questions, and as a result, courts are left to resolve the issue through statutory interpretation. Courts are required to fill the gaps in the statute in the crucible of an adversary proceeding.
B. Challenged Trial Court Instruction. The starting place of our analysis is a review of the jury instructions on Hasken-hoff s claim of negligence under the ICRA In Instruction No. 14, the marshalling instruction for sexual harassment, the jury was instructed Haskenhoff had to prove, among other things, that “6. Homeland Energy Solutions, L.L.C., knew or should have known of the occurrence of one or more sexually harassing incidents. ■ 7. Homeland Energy Solutions, L.L.C., acted negligently in creating or continuing a hostile work environment.” The language in Instruction No. 14 is drawn nearly verbatim from the United States Supreme Court description of direct negligence claims under Title VII provided in Vance v. Ball State University, 570 U.S. -, -, 133 S.Ct. 2434, 2452, 186 L.Ed.2d 565 (2013), which stated “an employer will always be liable when its negligence leads to the creation or continuation of a hostile work environment.”
With respect to negligence, Instruction No. 17 instructed the jury that
“Negligence” means failure to use ordinary care. Ordinary care is the care which a ' reasonably careful employer would use in similar circumstances. “Negligence” is doing something a reasonable careful employer would not do under similar circumstances, or failing to do something a reasonably careful *616 employer would do under similar circumstances. ■■
Except for substituting-the term “employer” for “person,” Instruction No. 17 is a verbatim version of Iowa State Bar Association Jury Instruction 700.2 entitled “Ordinary Care—Common Law Negligence-Defined.” This instruction has been used countless times in the courts of this state in negligence cases.
Finally, in Instruction No. 24, the jury was instructed that
[o]nce an employer knows or should have known of sexual harassment, it must take prompt remedial action rea- ‘ sonably calculated to end the conduct. The employer has a duty to take this remedial action even if an employee asks the employer not to do anything.
(Emphasis added.) Instruction No. 24 is derived from the affirmative defense for vicarious liability claims from Faragher-Ellerth.
C. Overview oí Review of Jury Instructions. In fashioning jury instructions, we have repeatedly stated that a trial court “need not instruct in a particular way so long as the subject of the applicable law is correctly covered when all the instructions are read together.” State v. Uthe, 542 N.W.2d 810, 815 (Iowa 1996). A trial court “is free to draft'jury instructions in its own language.” Hoekstra v. Farm Bureau Mut. Ins., 382 N.W.2d 100, 110 (Iowa 1986). We have emphasized that the court need not use terms suggested by the parties. Bossuyt v. Osage Farmers Nat’l Bank, 360 N.W.2d 769, 772 (Iowa 1985). And, pm; instructions do not need to follow particular authorities. In Bossuyt, we emphasized that an instruction on fraud was sufficient even though it did not follow the exact phrasing of the Restatement (Second) of Contracts. Id. at 774.
Our well-established Iowa caselaw is consistent with federal precedent. As noted by one federal appellate court, review of- jury instructions does not require “word-by-word hairsplitting.” Johnson v. Breeden, 280 F.3d 1308, 1314 (11th Cir. 2002). As long as instructions “accurately reflect the law, the trial judge is given wide discretion as to the style and wording employed.” United States v. Starke, 62 F.3d 1374, 1380 (11th Cir. 1995).
The question in considering the legal sufficiency of a jury instruction is whether relevant elements of a claim “may be adequately conveyed to the jury by the evidence and by argument of counsel under the instruction that the court gave.” Hillrichs v. Avco Corp., 478 N.W.2d 70, 74 (Iowa 1991), abrogated on other grounds by Reed v. Chrysler Corp., 494 N.W.2d 224, 226 (Iowa 1992). What is important is that the instructions, considered as a whole, were sufficient “so that the jurors understood the issues and were not misled.” Johnson, 280 F.3d at 1314 (quoting Starke, 62 F.3d at 1380). Generally understood terms which are in ordinary usage do not need to be defined. State v. Kellogg, 542 N.W.2d 514, 516 (Iowa 1996).
When error in a jury instruction is not of constitutional magnitude, “the test of prejudice is whether it sufficiently appears that the rights of the complaining party have been injuriously affected or that the party has suffered a miscarriage of justice.” State v. Gansz, 376 N.W.2d 887, 891 (Iowa 1985). Reversal is required if the jury instructions misled the jury or if the court materially misstates the law. Rivera v. Woodward Res. Ctr., 865 N.W.2d 887, 892 (Iowa 2015).
D. Positions of the Parties.
1. Defendants. HES maintains the district court erred in its jury instructions by “adopting a common law negligence standard” and denying. HES’s affirmative de *617 fense. Specifically, HES asserts that under the ICRA, HES was entitled to an instruction on the Faragher-Ellerth affirmative defense, which has been adopted by the United States Supreme Court. HES maintains that it is entitled to the Faragher-Ellerth defense in this case because the plaintiff’s claims involve a supervisor- and the alleged harassment did not culminate in a tangible employment action. Under Faragher-Ellerth, HES asserts entitlement to an affirmative defense that allows it to show “(a) [HES] exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that [Haskenhoff] unreasonably failed to take advantage of any preventative or corrective opportunities provided by [HES] or to avoid harm otherwise.” See Ellerth, 524 U.S. at 765, 118 S.Ct. at 2270.
HES recognizes .that in cases involving coworker harassment, a different, framework applies. -HES recognized that in Vance, the Supreme Court declared, “If the harassing employee is the victim’s coworker, the employer is liable only if it was negligent in controlling working-conditions.” 570 U.S. at -, 133 S.Ct. at 2439.
But HES claims that a plaintiff in a negligence case involving coworkers must prove more than the Vance formulation that the employer is liable only if it was negligent in controlling working conditions. Id. HES adds another element to the negligence claim. According to HES, in cases involving coworker harassment, the plaintiff is required to prove not only the presence of harassment that the employer knew or should have known existed, but also that the employer “failed to take prompt and appropriate corrective action.” McCombs v. Meijer, Inc., 395 F.3d 346, 353 (6th Cir. 2005). An instruction that the plaintiff must prove the defendant acted negligently in creating or continuing a sexually hostile environment is not enough according to HES. It claims that the district court was obligated to include its additional verbal formulation. HES further asserts prejudice arose from the failure to so instruct. Rivera, 865 N.W.2d at 892.
2. Haskenhoff. Haskenhoff argues that under the ICRA, a plaintiff may choose to proceed under either' a direct negligence or vicarious 'liability theory. She' asserts that she elected to proceed under a negligence theory, and thus the law related to vicarious liability claims against an employer is irrelevant,
Haskenhoff supports her choice-of-theories approach by citing language of the Supreme Court in Vance, 570 U.S. at -, 133 S.Ct. at 2434. In Vance, the United States Supreme Court stated “an employer will always be liable when its negligence leads to the creation or continuation of a hostile work environment.” Id. at -, 133 S.Ct. at 2452 (emphasis added). Hasken-hoff further cites Vance for the proposition that a situation where some harassers are coworkers and others are supervisors “presents no problem for the negligence standard.” Id. at -, 133 S.Ct. at 2451-52; see also Phelan v. Cook County, 463 F.3d 773, 784 (7th Cir. 2006) (declining to sort out who were supervisors since sexual harassment claim survived summary judgment via negligence method); Sharp v. Houston, 164 F.3d 923, 928-29 (5th Cir. 1999) (allowing jury instruction on negligence theory even though harasser was top manager in plaintiffs unit).
Because at trial Haskenhoff proceeded only on a -direct negligence theory, -she claims that HES was not entitled to the Faragher-Ellerth defense, which may be utilized only in a vicarious liability case. See Johnson v. Shinseki, 811 F.Supp.2d 336, 348 n.2 (D.C. Cir. 2011); Curry v. District of Columbia, 195 F.3d 654, 660 (D.C. Cir. 1999). According to Haskenhoff, the reason for the Faragher-Ellerth de *618 fense was to ensure that employers would not be held automatically liable for harassment involving supervisors. Faragher, 524 U.S. at 804, 118 S.Ct. at 2291; Ellerth, 524 U.S. at 763, 118 S.Ct. at 2270. But when vicarious liability is not asserted, the Far-agher-Ellerth framework is inapplicable. Direct negligence, according to Hasken-hoff, is a tried and true method of litigating sexual-harassment cases. See Boyle v. Alum-Line, Inc., 710 N.W.2d 741, 748 (Iowa 2006); Farmland Foods, Inc. v. Dubuque Human Rights Comm’n, 672 N.W.2d 733, 744 (Iowa 2003).
In addition, Haskenhoff maintains that HES was not prejudiced by the failure to give HES’s requested Faragher-Ellerth defense instruction. Haskenhoff argues the plaintiffs burden under a negligence standard is higher than that under Faragher-Ellerth. In a negligence case, Haskenhoff asserts, the plaintiff must prove the employer was negligent. In a vicarious liability case, however, the plaintiff does not have to prove negligence, and the defense has the burden of showing "prompt and effective” remedial action under Faragher-Ellerth.
E. The Distinction Between Direct Negligence Claims and Vicarious Liability Claims Under Federal and Civil Rights State Law.
1.Distinction between direct negligence and derivative liability. The federal and state civil rights caselaw clearly distinguishes direct negligence claims from claims based on vicarious liability. A direct negligence approach is generally used in federal cases under Title VII by plaintiffs who seek to thrust liability onto employers for the harassment they suffered at the hands of eoworkers. The direct negligence cases stress that employer liability for coworkers “is direct liability for negligently allowing harassment, not vicarious liability
for the harassing actions of employees.” Williamson v. Houston, 148 F.3d 462, 465 (5th Cir. 1998); Pierce v. Commonwealth Ufe Ins., 40 F.3d 796, 804 n.ll (6th Cir. 1994) (“The term ‘respondeat superior’— which connotes derivative liability—is an incorrect label for co-worker harassment cases, where the employer is directly liable for its own negligence.”).
2. Two types of direct negligence: negligence in the creation and negligence in the continuation of harassment. The Supreme Court explored some elements of a direct negligence claim in Vance, 570 U.S. at -, 133 S.Ct. at 2434. Vance held a plaintiff could bring a derivative claim based on vicarious liability for acts of a supervisor if the plaintiff suffers tangible adverse consequences of the harassment, but that vicarious liability could not arise if the consequences were intangible. Id. at -, 133 S.Ct. at 2439. In Vance, the Supreme Court recognized the two theories of direct negligence actions, observing that “an employer will always be liable when its negligence leads to the creation or continuation of a hostile work environment.” Id. at -, 133 S.Ct. at 2452 (emphasis added).
3. Relevant evidence in fact-based direct negligence actions. In discussing direct negligence actions as a distinct alternative to a derivative claim based on vicarious liability, the Vance Court observed, “Evidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed would be relevant.” Id. at -, 133 S.Ct. at 2453 (emphasis added). These evidentiary observations appear to be germane to direct negligence actions based on a failure to prevent and negligence related to the continuation of harassment.
*619 4. Combining coworkers and supervisors in direct negligence actions. While a direct negligence theory is generally used to affix liability to the employer when the harassers are solely coworkers, the question arises as to whether a direct negligence claim can also be made when one or even all of the harassers are supervisors. A plaintiff may want to use such a strategy when it is not entirely clear whether the harassers would be considered coworkers or supervisors. By assuming the burden of proving direct negligence, rather than shifting the burden to the defendant under the derivative approach of vicarious liability, the plaintiff avoids the risk that the court could ultimately conclude a harasser was not a supervisor and thus an employer could not be held derivatively liable on a vicarious liability theory. Thus, plaintiffs are not forced to litigate harassment cases involving supervisors under a vicarious liability theory. They may choose to proceed under the more demanding direct negligence theory.
There is dicta in support of the notion that supervisors may be considered coworkers for purposes of a direct negligence claim brought under Title VII. In Ellerth, the Supreme Court observed that while a derivative claim based upon a vicarious liability might be available for claims against supervisors under certain circumstances, “an employer can be liable, nonetheless, where its own negligence is a cause of the harassment.” 524 U.S. at 758-59, 118 S.Ct. at 2267. There is lower federal and state court authority consistent with the proposition that the conduct of supervisors may be considered part of a direct negligence claim brought by a Title VII plaintiff. See, e.g., Rios DaSilva v. One, Inc., 980 F.Supp.2d 148, 163 (D.P.R. 2013); Nadeau v. Rainbow Rugs, Inc., 675 A.2d 973, 976-77 (Me. 1996); Hoy v. Angelone, 456 Pa.Super. 596, 691 A.2d 476, 481 (1997).
F. The Kaleidoscope of Federal Circuit Model Jury Instructions on Direct Negligence in Harassment Cases. A survey of federal circuit court model jury instructions for harassment claims based on direct negligence demonstrates the kaleidoscope of verbal formulations that may be used in instructing juries on direct negligence claims. See generally 3C Kevin F. O’Malley et al., Federal Jury Practice and Instructions § 171:23, at 262-77 (6th ed. 2014) [hereinafter O’Malley 2014] (providing model jury instructions from the federal circuits and collecting cases on those instructions). Some instructions are long, some are short. In describing the plaintiffs burden in showing the employer was negligent, some use language of reasonableness, some use the somewhat narrower language of prompt and appropriate or effective remedial action, and many use both.
The model instruction for the United States Court of Appeals for the Third Circuit is detailed and elaborate. According to the Third Circuit model instruction, in sex: ual harassment cases involving nonsupervi-sors, the plaintiff must show that management “knew, or should have known of the abusive conduct.” Id. at 264. If the plaintiff proves its case, however, the defendant is allowed an affirmative defense. Id. at 265.
Interestingly, though, the affirmative defense, which the defendant has the burden of proving, is couched in terms of reasonableness. See id. According to the Third Circuit model instruction, in order to satisfy the requirements of the affirmative defense, the defendant must show (1) that it “exercised reasonable care” to prevent the harassment and to promptly correct any harassing behavior, and (2) that the plaintiff “unreasonably failed to take advantage of any preventive or corrective opportunities.” Id. On the first prong of *620 reasonableness, the Third Circuit offers a further instruction that a defendant meets that burden by showing the defendant had an explicit policy against harassment, the policy was fully communicated to its employees, the policy provided a reasonable way for plaintiff to make a claim of harassment, and reasonable steps were taken to correct the problem. Id. The Third Circuit instruction for coworker harassment tends to mix and match concepts of direct negligence liability with concepts of derivative liability based on vicarious liability theory as outlined in Faragher-Ellerth. See id. at 264-65.
The Fifth Circuit takes a materially different tack in a lengthy model instruction on direct negligent-harassment claims by coworkers. 3C Kevin F. O’Malley et al., Federal Jury■ Practice and Instructions § 171:23 (6th ed.), Westlaw (database updated Aug. 2016). Under the Fifth Circuit instruction for a claim of a hostile work environment involving coworkers based on direct negligence, the plaintiff must show the defendant “knew, or in the exercise of reasonable care should have known, that [the plaintiff] was being [sexually harassed] because of the [Plaintiffs sex].” Id. The Fifth Circuit instruction states the plaintiff must show that the harassment was “known by or communicated to a person who had authority to receive, address, or report the complaint,” or that the harassment was so “open and obvious” the defendant should have known of it. Id. In addition, the plaintiff must prove the defendant failed to take “prompt remedial action” to stop the harassment. Id. Interestingly, though, the instruction further defines “prompt remedial action” as conduct “reasonably calculated to stop the harassment and remedy the situation.” Id.
The' Seventh Circuit model jury instruction eschews the arguably meandering instruction of the Fifth Circuit for a more direct approach. O’Malley 2014, at 270-71. In a harassment case involving negligence, a jury in the Seventh Circuit is instructed that when harassment has been proved, an employer is liable if it “knew or should have known about the conduct” and “did not take reasonable steps to [correct the situation]/[prevent harassment from recurring].” Id. at 271. That is it. The Seventh Circuit model instruction is quite similar to the marshalling instruction given by the district court in this case and, compared to the Fifth Circuit model instruction, has the advantage of simplicity.
The Eighth Circuit model instruction requires that the plaintiff show the defendant “knew or should have known” of the alleged conduct and “the defendant failed to take prompt and appropriate corrective action.” Id. at 272. Although this instruction differs somewhat from the instruction in our case, “prompt and appropriate corrective action” does not seem to be a lesser standard than “reasonableness,” An action that is not “prompt” might still be considered reasonable by a jury, while an action that is “appropriate” is surely also reasonable.
The Ninth Circuit has a longer model instruction for direct negligence claims, but it comes to essentially the same place as the Seventh Circuit’s instruction. Id. at 274-75. Under the.Ninth Circuit’s instruction, a plaintiff who proves harassment and seeks to impose liability on the employer must show that “the defendant or a member of the defendant’s management knew or should have known of the harassment and failed- to take prompt, effective remedial action reasonably calculated to end the harassment.” Id. at 274. The Ninth Circuit instruction further defines who qualifies as management and states the defendant’s remedial action “must be reasonable and adequate.” Id. Although more detailed, there is no substantive difference between *621 the Ninth Circuit instruction and the totality of the district court’s instruction in this case.
What these diverse jury instructions demonstrate is that there is not one “correct” jury instruction in a direct negligence case..They can vary from the fairly complex instructions used by the Fifth and Ninth Circuits to the very simple instruction utilized by the Seventh Circuit.. It is clear, however, that the model instructions in the Fifth, Seventh, Eighth, and Ninth Circuits are consistent with the trial court’s instruction in this case.
G. Iowa Caselaw on Negligence Claims, In the pre-Faragher-Ellerth cases of Chauffeurs, Teamsters & Helpers, Local Union No. 238 v. Iowa Civil Rights Commission, 394 N.W.2d 375 (Iowa 1986), and Lynch v. Des Moines, 454 N.W.2d 827 (Iowa 1990), we considered cases in which the plaintiff claimed the defendants maintained hostile environments based on race and sex respectively. In describing one of the elements of a hostile-environment claim, we stated in Lynch that the plaintiff must prove “the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." 454 N.W.2d at 833 (emphasis added). In Chauffeurs, we used a slightly different verbal formulation, indicating that the plaintiff needs to prove the defendant knew or should have known of the harassment and “failed to take prompt remedial action.” 394 N.W.2d at 378 (emphasis added). The cases do not discuss a difference between “prompt remedial action” or “prompt and appropriate remedial action.” In both cases, we held the evidence sufficient to support the plaintiffs claims.
In another pr e-Faragher-Ellerth' case, Vaughn v. Ag Processing, Inc., we again were asked to consider a hostile-environment harassment claim, this time based on religion. 459 N.W.2d 627, 632 (Iowa 1990). We noted specifically the plaintiff did not assert, that “Mueller, as supervisor, was acting as Ag or that Ag was strictly liable for Mueller’s actions.” Id. at 634. In other words, plaintiff was pursuing a direct negligence theory and not an agency theory that would give rise to strict liability against the employer.
Unlike in Chauffeurs and Lynch, however, we found in Vaughn that the defendant was entitled to prevail. Id. at 639. We found that while the defendant knew of the harassment, the employer took prompt remedial action to remedy the problem. Id. at 634. We explained “prompt remedial action” as placing “a reasonable duty on an employer who is aware of discrimination in the workplace to take reasonable steps to remedy it.” Id. At 634’ (emphasis addéd). We noted that whether an employer takes such reasonable steps ‘ to remedy the harassment is a question of fact. Id. We further noted in Vaughn that the employer’s conduct was “especially reasonable” in light of the evidence which showed that the employer did not know the plaintiff was a victim of religious discrimination. Id. at 635. Under Vaughn, it seems that “prompt remedial action” and “reasonableness” are interchangeable concepts, much like the model instructions in the Fifth and Ninth Circuits.
Our first post-Faragher-Ellerth ease involving a claim of a hostile environment was Farmland Foods, 672 N.W.2d 733. In Farmland Foods, we cited Eighth Circuit precedent for the proposition that in order to establish a hostile-environment claim, a plaintiff must show the employer “knew or should have known of the harassment and failed to take proper remedial action.” Id. at 744. We then added, as dictum, a sentence stating, “When a supervisor perpetrates the 'harassment, but no tangible employment ’ action occurred, the employer may assert the Faragher-Ellerth affirma *622 tive defense to avoid liability.”[28] Id. In Farmland Foods, we concluded the plaintiff failed, on the evidence presented, to show a hostile environment of racial harassment. Id. at 746. As a result, the question of whether the employer acted reasonably in response to the allegedly hostile environment was not considered.
In Boyle, 710 N.W.2d at 741, we considered whether a plaintiff established a hostile environment based on sex. The district court concluded the employer knew of the harassment but the employer “did take steps reasonably calculated to stop the sexual harassment.” Id. at 747 (emphasis added). We also stated that in order to establish liability for a hostile environment, a plaintiff must show that “the employer knew or should have known of the harassment and failed to take proper remedial action.” Id. at 746 (emphasis added) (quoting Farmland Foods, 672 N.W.2d at 744). We equated the test, however, with “steps reasonably calculated to end the sexual harassment.” Id. at 747 (emphasis added). After canvassing the record, we concluded the record did not support the trial court’s conclusion that the employer took steps reasonably calculated to stop the harassment. Id. Because the employer did not show that it took steps “reasonably calculated to stop the sexual harassment,” we stated that the employer failed to “implement prompt and appropriate corrective action.” Id. at 748. In Boyle as in Vaughn, the shorthand phrases “prompt remedial action” and “prompt and appropriate action” are equated with steps “reasonably calculated to stop the sexual harassment.” See id.; Vaughn, 459 N.W.2d at 634.
H. Discussion: Can the Faragher-El-lerth Defense “Jump the Track”?[29] At the outset, there is no question under the current prevailing state and federal case-law that a plaintiff in a sexual-harassment case may proceed against an employer on a direct negligence theory and that the direct negligence theory is distinct from a derivative claim based on vicarious liability. I would thus set aside the caselaw that might relate to derivative claims based on vicarious liability and focus solely on the law related to direct negligence.
In direct negligence cases, an employer is entitled to a jury instruction stating that the plaintiff has the burden of proving the employer’s negligence “leads to the creation or the continuation of a hostile work environment.” Vance, 570 U.S. -, 133 S.Ct. at 2452. Under negligence theory, there is no Faragher-Ellerth affirmative defense. The Faragher-Ellerth affirmative defense, if it is available, applies only in cases based on vicarious liability. Beckford v. Dep’t of Corr., 605 F.3d 951, 960-61 (11th Cir. 2010) (finding a refusal to give a Faragher defense instruction proper when plaintiff did not argue vicarious liability).[30]
*623 As a result, it is important to note that under a claim based on negligence, the second prong of the Faragher-Ellerth defense, namely, that the employer may prove the plaintiff failed to avail herself of an employer’s internal remedy, has no application. Indeed, that is the main advantage of a negligence claim—specifically, that it can provide a basis for liability when the harassment victim never formally complained to his or her employer. See Zayadeen v. Abbott Molecular, Inc., No. 10 C 4621, 2013 WL 361726, at *1 (N.D. Ill. Jan. 30, 2013); Andrew Freeman, A Bright Line, But Where Exactly ? A Closer Look at Vance v. Ball State University and Supervisor Status Under Title VII, 19 Lewis & Clark L. Rev. 1163, 1161-62 (2013). The fact that a report to management is not required is an important feature of direct negligence liability, for many women are reluctant to step forward to report sexual harassment to superiors. See L. Canute Hebert, Why Don’t “Reasonable Women” Complain About Sexual Harassment?, 82 Ind. L.J. 711, 724-29 (2007). For instance, some victims may not report harassment for fear of retaliation from coworkers. See Christopher M. Courts, Note, An Adverse Employment Action—Not Just an Unfriendly Place to Work: Co-Worker Retaliatory Harassment Under Title VII, 87 Iowa L. Rev. 235, 236 (2001).
As a result, HES’s argument that it was entitled to an affirmative Faragher-Ellerth defense is without merit. Interestingly, however, the trial court did instruct the jury on the first prong of the Faragher-Ellerth affirmative defense in Instruction No. 24. That instruction stated that HES had the burden of showing that it took prompt and appropriate remedial action reasonably calculated to end the conduct. In a negligence action, however, HES does not have any burden. Rather, the burden is always on the plaintiff to prove negligence. But HES sought this instruction and does not object to it now. It may have been wrong, but HES cannot complain about an instruction it sought and does not challenge on appeal.
I now turn to- the question of whether the district court properly instructed the jury on what the plaintiff must show to affix liability to HES based upon direct negligence. The marshalling instruction required the plaintiff to prove that HES acted “negligently in the creation or continuance of a hostile work environment.” These words are virtually lifted verbatim from Vance and are a correct statement of law.
So far so good. Next, the district court offered an instruction on negligence. The district court instructed the jury that “negligence” means “the failure to exercise ordinary care.” Further, “ordinary care is the' care which a reasonably careful employer would use under all the circumstances.”
HES asserts the district court’s formulation is inadequate. It insists the district court was required to instruct the jury that the plaintiff must show not that the employer failed to act reasonably, but instead that the employer failed to use “prompt and appropriate remedial action.”
In short, HES insists on magic words. But not only does our law not require magic words for jury instructions, but. such demanding word regimes are contrary to our declarations that the trial court “need not instruct in a particular way so long as the subject of the applicable law is correctly covered.” Uthe, 542 N.W.2d at 815; Hoekstra, 382 N.W.2d at 110.
One can only wonder what the difference is between acting reasonably and act- *624 mg appropriately. Federal cases refer to such arguments with disdain as “word-byword hairsplitting.” See Johnson, 280 F.3d at 1314. Certainly, the difference between the concept of reasonability in the district court’s negligence instruction and appropriateness in HES’s formulation is not a basis for reversal here,
HES’s formulation also uses the term “prompt” while the district court’s instruction simply referred to reasonability. This is not the stuff of reversible error. Our caselaw has repeatedly equated prompt remedial action with action “reasonably calculated to stop the sexual harassment” or placing a “reasonable duty on an employer who is aware of discrimination in the workplace to take reasonable steps to remedy it.” Boyle, 710 N.W.2d at 747; Vaughn, 459 N.W.2d at 634. If anything, the term “prompt” may be more demanding on the employer than the reasonability requirement as instructed by the district court. In any event, I would find that no reasonable jury would draw a distinction between reasonable action by an employer to stop the harassment and prompt and appropriate remedial action.
In considering the negligence instructions given in this case, the instructions accurately reflect the law. The instructions were very close to the model instruction in use in the Seventh Circuit and, in their totality, are certainly consistent with the model instructions in the Fifth and Ninth Circuits. The district court instructed the jury in the marshalling instruction that Haskenhoff had the burden to prove that HES “knew or should have known” of the harassment. The instruction further required Haskenhoff to prove that HES “acted negligently in creating or continuing a hostile work environment.” The district court also gave a proper instruction to the jury regarding the meaning of negligence as a failure to use ordinary care “which a reasonably careful employer would use in a similar circumstance.”
The fact the instruction was adequate is demonstrated by the record in this case. In her opening statement, Haskenhoff told the jury that “an employer has a duty to .., protect its employees insofar as they can reasonably do so from sexual harassment.” Further, Haskenhoff told the jury “if an employer knows about sexual harassment and lets it continue for a month—let alone several' months—and it violates the law ... the employer must compensate the victim for whatever harm is caused.”
In its opening statement, HES responded that “this is a case about a lab manager that failed for months or years to report prohibited conduct and, before HES could act on the information she reported, quit on the job.” HES further asked the jury “will the evidence show that the plaintiff followed HES policy ... and that HES was given a chance to promptly remedy the conduct that she did report?” Then in closing argument, Haskenhoff told the jury,
Homeland acted negligently.... They did not monitor the workplace. They did nothing more to protect Tina going forward .... They did nothing to stop it. They allowed the environment to continue and caused great harm to Tina.... Once the employer knows or should have known about sexual harassment, it must take prompt remedial action reasonably calculated to end the conduct.
(Emphasis added.) Thus, in the closing statement, Haskenhoffs counsel told the jury that the obligation of the employer, once it knew dr should have known about the harassment, was to take “prompt remedial action reasonably calculated to end the conduct.”
In its closing statement, HES picked up on the plaintiffs closing argument. HES *625 told the jury that “she ..needs to prove ... that HES failed to act reasonably and responsibly in a way calculated to bring the conduct of which she complained to an end. That’s the biggest question.”
Further, HES told the jury that
Instruction 17 and 24 go to the last element, if you will. What the plaintiff has to prove is that this employer was either not doing something a reasonable careful employer would do or failed to do something a reasonably careful employer would do.
HES further asked the jury “did the company put a plan together that was reasonably calculated to end the conduct?” According to HES, the company “wanted it to just stop,” and cited “the evidence here that it did.” In rebuttal, Haskenhoff told the jury, “You have to conduct prompt, thorough and impartial investigation into any potential sexual harassment, however you become aware of it, whether it is in a written complaint or not, whether you see or whether it’s just a rumor.”
What the opening and closing arguments demonstrate is that the instructions, though brief like the Seventh Circuit model instruction, were clearly and demonstrably sufficient to allow HES to make the argument which it claims on appeal it was foreclosed from making. See Hillrichs, 478 N.W.2d at 74 (finding instructions adequate in which they allowed consideration of evidence and arguments by counsel on legal elements). HES thus advances a battle not over principle, but over semantics. Under the instructions, Haskenhoff .had the burden of proving negligence. As the model instructions of the various circuits indicate, “prompt and effective remedial action” is another way of expressing reasonableness. See also Lehmann v. Toys ‘R’ Us, Inc., 132 N.J, 587, 626 A.2d 445, 464 (1993) (“Effective” remedial measures are those “reasonably calculated to end the harassment.”); Campbell v. Fla. Steel Corp., 919 S.W.2d 26, 33 (Tenn. 1996) (stating no precise definition of “prompt and appropriate remedial action” though in general employers are required to take steps “reasonably calculated” to terminate harassment); Davis v. Modine Mfg., Co., 979 S.W.2d 602, 607 (Tenn. Ct. App. 1998) (equating “prompt and appropriate corrective action” with action “reasonably calculated to terminate the alleged harassment”). If HES could convince a jury that it took prompt and effective remedial action, it would not be found to have acted unreasonably. There is no error in the instructions that were based on the language of Vance and the ISBA Model Jury •Instruction defining negligence.
IV. Causation Instruction on Retaliatory Discharge.
A. Introduction.
1. Ambiguity in “because” language. Causation has been one of the most controversial aspects of employment law. The literature is chock-full of alternate causation standards, including “but for,” “motivating factor,” “substantial factor,” “a motivating factor,” and similar terms. There are arguments aplenty for each of them. See generally Kendall D. Isaac, Is It “A” Or Is It “The”? Deciphering the Motivating-Factor Standard in Employment Discrimination and Retaliation Cases, 1 Tex. A&M L. Rev. 55, 73-77 '(2013); Schwartz, 150 U. Pá. L. Rev. at 1708 (citing various different approaches to causation requirement).
By using “because” in Iowa Code section 216.11(2), the section related to causation in retaliation cases, the Iowa legislature has left the causation question to the courts to determine as a matter of statutory construction. Because the statute is ambiguous, we have a number of plausible *626 interpretive choices. In exercising our authority to construe the statute and choose among plausible interpretive choices, we must be cognizant of the text of the statute, its goals, and the legislative direction to construe the ICRA broadly to effectuate its underlying purposes. Id. § 216.18(1).
2.Centrality of reporting requirements in Iowa civil rights law and linkage to substantive violations. Some may regard a retaliation claim as a second-class claim under the ICRA compared to status-based discrimination claims. Retaliation claims, however, are not second-class claims at all, but instead are claims that strike at the very heart of the enforcement regime of the ICRA. Under the ICRA, a claimant is required to file a timely claim with the Iowa Civil Rights Commission in order to present a claim. McElroy v. State, 703 N.W.2d 385, 391 (Iowa 2005). The requirement is mandatory. See id. Thus, being able to file a claim free from fear of workplace retaliation is directly linked to the ability of a claimant to vindicate his or her rights under the ICRA. A statute that forces workers to invoke an administrative process or to cooperate in subsequent investigations should protect workers who comply. Sandra F. Sperino, Retaliation and the Reasonable Person, 67 Fla. L. Rev. 2031, 2074 (2015) [hereinafter Speri-no, Retaliation].
As a result, keeping the channels of reporting potential civil rights claims free, open, and unfettered is crucial to vindicating the substantive policies of the ICRA. And, closing the channels of reporting through retaliation does not only affect the party but harms the system itself. See Richard Moberly, The Supreme Court’s Antiretaliation Principle, 61 Case W. Res. L. Rev. 375, 380 (2010) (citing law enforcement rationale). In addition to protecting the person claiming discrimination, coworkers participating in investigations need protection if the system is to function properly. A retaliation claim thus is not a satellite claim on the fringes of civil rights law. It is an essential claim, without which the ICRA could not fulfill its laudatory statutory purpose.
3. Purpose of retaliation provision as affecting causation. In considering whether the plaintiff has presented sufficient evidence to reach a jury on a retaliation claim, much debate has occurred on the level of causation—a motivating factor, a substantial factor, a but-for factor, etc. Aside from level of causation, however, there is another issue. Causation is not a free radical floating around the employment law universe untethered to any other legal principle. There is a relational question, namely, causal connection in relation to what, exactly?
And that is a key question. In the retaliation context, the question is whether the causation is judged by whether the alleged retaliatory conduct would likely deter a plaintiff from making a complaint contemplated by our civil rights laws. Or, is it judged by whether it “affects a term, condition, or privilege” of employment? This relational question is just as important as the calibration of the “level” of causation required in determining whether a plaintiff has made a sufficient showing to support a retaliation claim.
4. Difficulty of fact-finding in retaliation cases. Finally, we should recognize the evidentiary challenges facing a plaintiff in proving a retaliation claim. In retaliation cases, we are necessarily probing into difficult factual issues involving the motivation of the defendant. The evidence related to motivation is almost always in the hands of the defendant. In addition, the evidence in the modern work place is often indirect, although “smoking guns” are still occasionally uncovered.
*627 Further, to the extent causation involves whether a reasonable person in the position of the plaintiff would be deterred from utilizing appropriate reporting procedures, the question becomes highly contextual. Highly contextual factual issues are rarely amenable to summary judgment.
B. Challenged Trial Court Instructions. With respect to her retaliation claim, the jury was instructed that Hask-enhoff need only prove that her report of sexual harassment “played a part” in HES’s decision to take adverse employment action against her to prevail on her retaliation claim. The jury was further instructed that to “play a part” the report need only have been “a factor” in HES’s employment action but “need not be the only factor.”
HES offered an instruction that Hask-enhoffs report of sexual harassment must have been “a significant factor motivating the Defendant’s decision to take materially adverse employment action against Plaintiff’ in order for the jury to find in favor of Haskenhoff on her retaliation claim.
C. Federal Caselaw on Causation Standard for Civil Rights Claims.
1. Causation standard for status-based discrimination. Title VII of the Civil Rights Act of 1964 provides that it “is an unlawful employment practice for an employer ... to discriminate against any individual ... because of such individual’s race, color, religion, sex, or national origin.” 42 U.S.C. § 2000e-2(a)(l)-(2) (emphasis added). Like prior state legislatures who used the term in them state civil rights acts, Congress provided no guidance as to the meaning of the ambiguous phrase “because of’ in its status-based discrimination provision. The meaning of the phrase “because of’ has been a major point of controversy in federal civil rights law.
Early federal caselaw struggling with the “because of’ language came to mixed results. Many federal courts adopted a relaxed standard of proof close to a played-apart standard. See King v. N.H. Dep’t of Res. & Econ. Dev., 420 F.Supp. 1317, 1327 (D. N.H. 1976). Others adopted something like a significant-factor test. See Baldwin v. Birmingham Bd. of Educ., 648 F.2d 950, 956 (5th Cir. 1981); Whiting v. Jackson State Univ., 616 F.2d 116, 121 (5th Cir. 1980). Some cases embraced a more stringent determinative-factor or motivating-factor test. See Womack v. Munson, 619 F.2d 1292, 1297 (8th Cir. 1980).[31]
In Price Waterhouse, the United States Supreme Court considered the meaning of the term “because of’ under the status-based classification provision of Title VII. 490 U.S. at 239-40, 109 S.Ct. at 1785. A majority of the court concluded the proper approach to the phrase “because of’ was a motivating-factor test. Id. at 258, 109 S.Ct. at 1795 (plurality opinion); id. at 259, 109 S.Ct. at 1795 (White, J., concurring); id. at 276, 109 S.Ct. at 1804 (O’Connor, J., concurring). As Justice Brennan noted in his plurality opinion, Congress has specifically rejected an amendment to put.the term “solely” in front of the “because of’ language. Id. at 241, 109 S.Ct. at 1785 (plurality opinion). According to Justice Brennan, Congress intended to eliminate employment decisions in which discriminatory motivation “played a part” in an employment decision, even if it was not the sole basis for the decision. Id.
The Price Waterhouse Court, however, added an important caveat to its motivating-factor interpretation. In cases of mixed *628 motive, the Price Waterhouse Court concluded that an employer was entitled to a “same decision” affirmative defense. Id. at 242, 109 S.Ct. at 1786. In other words, if an employer could show in a mixed-motive case that the same decision would have been made absent the discriminatory motivation, the employer could escape liability. Id.
In response to the same-decision aspect of Price Waterhouse and other Supreme Court civil rights decisions, Congress enacted the Civil Rights Act of 1991. Civil Rights Act of 1991, Pub. L. No. 102-166, 106 Stat. 1071 (codified at 42 U.S.C. § 2000e-2(m)). The purpose of the 1991 Act, according to Congress, was to provide “additional protections against unlawful discrimination in employment.” Id. The Civil Rights Act of 1991 added the following section to Title VII: “[A]n unlawful unemployment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.” 42 U.S.C. § 2000e-2(m) (emphasis added). This section plainly endorsed the motivating-factor approach of Price Waterhouse.
Congress further amended the statute, however, to limit the same-decision affirmative defense established in Price Water-house. Congress limited the same-decision defense by providing that if the employer demonstrates that it
would have taken the same action in the absence of the impermissible motivating factor, the court ... may grant declaratory relief, injunctive relief ... and [limited] attorney’s fees and costs ... and ... shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment.
42 U.S.C. § 2000e-5(g)(2)(B). The impact of this amendment provided employees with greater protection than allowed under the Supreme Court’s decision in Pri.ce Wa-terhouse. The same-decision amendment was thus consistent with the underlying statutory purpose of the Civil Rights Act of 1991 to “provide additional protections” to employees suffering from impermissible discrimination.
Notably, however, the Civil Rights Act of 1991 did not amend the retaliation provision of Title VII, which also contains a because-of requirement of causation. What gloss should be put on the because-of language in the retaliation in light of the Price Waterhouse and the Civil Rights Act of 1991?
There were a number of possible approaches. Several courts concluded that because Congress did not specifically amend the separate retaliation section in the Civil Rights Act of 1991, the causation standard existing before the passage of the Act announced in Price Waterhouse provided the proper approach to causation in retaliation claims. See, e.g., Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 552 n.4 (10th Cir. 1999); Woodson v. Scott Paper Co., 109 F.3d 913, 934-35 (3d Cir. 1997); Tanca v. Nordberg, 98 F.3d 680, 683-84 (1st Cir. 1996). While recognizing that the Civil Rights Act of 1991 amendments did not extend to retaliation claims, these courts took the position that the Supreme Court’s decision in Price Waterhouse, which involved a status-based claim, did extend to retaliation claims. These courts thus relied on the unique nature of the 1991 legislation to uncouple the causation standard of retaliation-based claims from status-based claims.
Other federal courts seem to have taken a different approach. Although short of an express holding, the Seventh Circuit in Veprinsky v. Fluor Daniel, Inc., cited the *629 1991 amendments establishing a motivating-factor causation test for status-based discrimination as also applying for treatment of retaliation claims. 87 F.3d 881, 886, 887 n.3 (7th Cir. 1996); see also Hall v. City of Brawley, 887 F.Supp. 1333, 1345 (S.D. Cal. 1995) (finding impermissible motivation, sustaining “same decision” defense, but affording statutory remedies permitted under Civil Rights Act of 1991 but not under Price Waterhouse). In de Llano v. North Dakota State University, the district court concluded that “it would be illogical and contrary to congressional intent to apply different standards of proof and accompanying relief provisions to retaliation claims as opposed to discrimination claims.” 951 F.Supp. 168, 170 (D. N.D. 1997).
The fighting issue in this split was whether the employer was entitled to a complete same-decision affirmative defense under Price Waterhouse for' retaliation claims, or whether the limitations of the same-decision defense contained in the 1991 Act were applicable. See generally Lawrence D. Rosenthal, A Lack of “Motivation” or Sound Legal Reasoning? Why Most Courts Are Not Applying Either Price Waterhouse’s or the 1991 Civil Rights Act’s Motivating-Fa'ctor Analysis to Title VII Retaliation Claims in a Post-Gross World (But Should), 64 Ala. L. Rev. 1067, 1070-73 (2013).
2. Causation standard for claims under the Federal ADEA at variance with generally applicable federal status-based causation test. In Gross, the United States Supreme Court considered the question of causation in an age discrimination case brought under the ADEA. 557 U.S. at 169-70, 129 S.Ct. at 2346. Unlike Iowa law, which has a unified statute, age discrimination in the federal regime is addressed in a separate statutory provision.
In Gross, the Court considered the .meaning of an ADEA provision which .stated,
It shall be unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual’s age..
Id. at 182, 129 S. Ct. at 2353 (quoting 29 U.S.C. § 623(a)(1) (emphasis added)).
The district court in Gross instructed the jury that liability could be based upon a determination that age was a motivating factor. 557 U.S. at 170-71, 129 S.Ct. at 2347. The jury returned a verdict in favor of the plaintiff. Id. at 171, 129 S.Ct. at 2347. On appeal, the Eighth Circuit reversed. Id. The Eighth Circuit ruled that because the plaintiff did not advance any direct evidence of age discrimination, the plaintiff was not entitled to a mixed-motive instruction under Price Waterhouse. Id. While the question presented focused on whether a plaintiff must present direct evidence of age discrimination to obtain a mixed-motive jury instruction under the ADEA, the Supreme Court instead decided to answer the question of whether a mixed-motive, instruction is even allowed under the ADEA, Id. at 173, 129 S.Ct. at 2348.
In a 5-4 decision, the United States Supreme Court held that Price Water-house-type burden shifting did not apply to claims brought under the ADEA. Id. The reasoning of the Gross Court, however, is pertinent to this case. The Supreme Court stressed that in statutory interpretation, the court “must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination.” Id. at 174, 129 S.Ct. at 2349. The Supreme Court emphasized that Title VII,- after the 1991 amendments, ex *630 pressly authorized mixed-motive analysis, while no similar change was introduced into the ADEA. Id. Using dictionary definitions, the majority concluded that “because of’ in the ADEA meant “but for” rather than the lesser standard in Price Waterhouse. Id. at 176-77, 129 S.Ct. at 2350.
Obviously, the analysis in Gross of “because of’ in the ADEA was at odds with the similar analysis of the exact same term in Title VII in Price Waterhouse. There were now two competing approaches to “because of’ in the United States Supreme Court precedents. With respect to retaliation claims under Title VTI, the question after Gross was whether the motivating-factor approach to “because of’ in Price Waterhouse would apply to retaliation claims under Title VII, or would the new Gross but-for test for “because of’ supplant it.
3. Causation standard for federal retaliatory claims. In University of Texas Southwestern Medical Center v. Nassar, another bare 5-4 majority of the Supreme Court held that the proper causation test for a retaliation claim under Title VII is the but-for test. 570 U.S. -, -, 133 S.Ct. 2517, 2534, 186 L.Ed.2d 503 (2013). The Nassar majority focused on the language of the Civil Rights Act of 1991. Id. at-, 133 S.Ct. at 2526. Specifically, the majority noted that in 1991, Congress required a motivating-factor causation test for status-discrimination claims, but did not expressly extend that standard to retaliation claims. Id. at -, 133 S.Ct. at 2529. The majority characterized this as a structural choice. Id. The majority emphasized the importance of allowing Congress to choose its structure by differentiating between the status-discrimination and the retaliation provisions of Title VII. Id. The majority then compared the “because of’ language in the ADEA with the “because of’ language in the provision of Title VII. Id. at -, 133 S.Ct. at 2528-29. Finding them similar, and finding the rationale of Gross equally applicable to the retaliation provision, the Supreme Court concluded that a but-for test for retaliation under Title VII was proper. Id. at -, 133 S.Ct. at 2533. Interestingly, by its “structural” interpretation, the Supreme Court majority used the Civil Rights Act of 1991— which was designed to provide additional protections—to narrow protections under the retaliation provision of Title VII.
The majority also offered a pragmatic justification for the but-for test. Citing increases in the number of retaliation claims with the EEOC, the majority stated that it was of “central importance” to the judicial system to limit the number of claims. Id. at -, 133 S.Ct. at 2531. According to the majority, if the Court used a motivating-factor standard, frivolous claims would increase and judicial resources would be diverted from genuine efforts to combat discrimination. Id. at -, 133 S.Ct. at 2531-32.
Justice Ginsburg—joined by Justices Breyer, Kagan, and Sotomoyor—dissent-ed. Id. at -, 133 S.Ct. at 2534 (Ginsburg, J., dissenting). Justice Ginsberg maintained that “retaliation for complaining about discrimination is tightly bonded to the core prohibition [of discrimination] and cannot be disassociated from it.” Id. Justice Ginsburg noted with irony that the majority utilized a statutory revision designed to strengthen the Civil Rights Act to weaken it in retaliation claims. Id. at -, 133 S.Ct. at 2540-41. Justice Ginsburg argued that the 1991 Amendment to the Civil Rights Act applied to “any employment practice,” a phrase broad enough to include retaliation claims. Id. at -, 133 S.Ct. at 2539. She rejected the conservation-of-resources argument, declaring that the majority was blinded by “a zeal to *631 reduce the number of retaliation claims filed against employers.” Id. at -, 133 S.Ct. at 2547.
D. State Caselaw on Causation Standard for Retaliation Claims.
1. Causation test on generally applicable discrimination. The vast majority of state courts have generally adopted a version of Price Waterhouse for status-based discrimination claims. For instance, in Harvard v. Bushberg Brothers, Inc., the New Jersey court emphasized that discrimination. on the basis of sex is shown if sex played at least a part and was a causal factor in the failure of the complainant to be promoted. 137 N.J.Super. 537, 350 A.2d 65, 67 (1975). In Navy v. College of the Mainland, a Texas court noted some division in the federal cases about required causation, but ultimately adopted a motivating-factor test based on the plain meaning of Texas law. 407 S.W.3d 893, 899 & n.3 (Tex. App. 2013).
2. Causation test regarding retaliation. State courts have adopted a wide range of tests for claims based on retaliatory conduct by an employer. They range from the least demanding a-factor test to the most demanding but-for test.
In VECO, Inc. v. Rosebrock, the Alaska Supreme Court considered the standard for causation in a retaliation case. 970 P.2d 906, 920 (Alaska 1999). The Alaska court noted that under Price Waterhouse, “because” meant a “motivating part in an employment decision” and held that a plaintiff was required to meet the same test in a retaliation case under Alaska law. Id. In Mole v. University of Massachusetts, the Massachusetts court also considered causation in a retaliation case. 442 Mass. 582, 814 N.E.2d 329, 338 (2004). The Massachusetts court stated the plaintiff must show that “a causal connection existed between the protected conduct and the adverse action.” Id. at 339; see also Hollins v. Federal Nat’l Mortg. Ass’n, 760 A.2d 563, 579 (D.C. 2000).
In Ruffin Hotel Corp. of Maryland, Inc. v. Gasper, the Maryland court considered the proper causation test in a retaliatory discharge case. 418 Md. 594, 17 A.3d 676, 686 (Md. Ct. App. 2011). The Maryland court adhered to a motivating-factor test in the retaliation context. Id. The Maryland court noted that in Price Waterhouse, the Supreme Court expressly rejected a but-for test for status discrimination, quoting Price Waterhouse for the proposition that to construe the words “because of” as a short hand- for “but for” is “to misunderstand them.” Id. at 685. The Maryland court cited the Supreme Court’s handiwork in Desert Palace for the proposition that a motivating factor was sufficient to establish causation in a Title VII status-classification claim. Id. (citing Desert Palace, 539 U.S. 90, 123 S.Ct. 2148).
Similarly, in Mele v. Hartford, the Connecticut Supreme Court considered the question of what a plaintiff must show in the context of a claim that the employer retaliated because of the plaintiffs assertion of his right to workers’ compensation benefits. 270 Conn. 751, 855 A.2d 196, 206 (2004). The Connecticut court held the plaintiff must show that retaliatory motive “played a part” in the adverse employment action. Id. at 211. Consistent with Mele, a Connecticut trial court expressly declined to follow the Nassar and Gross cases. Gonska v. Highland View Manor, Inc., No. CV126030032S, 2014 WL 3893100, at *7 (Conn. Super. Ct. June 26, 2014). Instead, the Connecticut court adopted the McDonnell Douglas burdén-shifting approach, coupled with the more lenient motivating-factor standard, which only requires a showing that a retaliatory motive contributed or played a part in the adverse action' Id.
*632 Missouri courts have developed a contributing-factor test for causation in retaliation cases. See Turner v. Kan. City Pub. Sch., 488 S.W.3d 719, 723 (Mo. Ct. App. 2016); Williams v. Trans States Airlines, Inc., 281 S.W.3d 854, 866 (Mo. Ct. App. 2009); McBryde v. Ritenour Sch. Dist., 207 S.W.3d 162, 170 (Mo. Ct. App. 2006). It is not entirely clear what “contributing” means or how it adds to the analysis.
Some states have adopted a substantial-factor test. For instance, in Allison, the Washington Supreme Court adopted a substantial-factor test for retaliation claims under the Washington Human Rights Act. 821 P.2d at 38. In rejecting the but-for test, the Washington Supreme Court emphasized the legislative instruction that Washington courts provide a liberal construction of the Act. Id. at 37. As a result, the Washington Supreme Court noted the local statute differed from Title VII, which did not contain a liberal-construction directive. Id. at 38. The Washington Supreme Court concluded that a but-for causation standard would put an unrealistic burden on plaintiffs, limiting the ability of many plaintiffs to assert antidiscrimination claims. Id. at 42. On the other hand, the court rejected a “to any degree” standard advocated by the plaintiff. Id. According to the Washington court, even a slight retaliatory animus could be the basis of employer liability. Id. at 42. The Washington court characterized its substantial-factor test as an intermediate one. M; see also Rymal v. Baergen, 262 Mich.App. 274, 686 N.W.2d 241, 249 (2004) (stating to establish causation in retaliation case, plaintiff must show illegal action was “a significant factor” in adverse action).
In the above substantial-factor cases, it is not entirely clear how stringent the test is. In Lacasse v. Owen, the Oregon court suggests that the substantial-factor test is about the same as a. but-for test. 278 Or. App. 24, 373 P.3d 1178, 1183 (2016). This view, of course, is in variance with the Allison court, which interpreted the sub-stántial-factor test as falling well short of the but-for test. See 821 P.2d at 35.
The Supreme Court of California considered the standard for retaliation claims in Harris v. Santa Monica, 56 Cal.4th 203, 152 Cal.Rptr.3d 392, 294 P.3d 49, 66 (2013). The Harris court developed a substantial-motivating-factor or -reason test. Id. The court drew a distinction between a substantial-motivating factor and a motivating factor. Id. According to the court, the substantial-motivating-factor test ensured that liability would not be imposed “on evidence of mere thoughts or passing statements unrelated to the disputed employment decision.” Id.; see Alamo v. Practice Mgmt. Info. Corp., 219 Cal.App.4th 466, 161 Cal.Rptr.3d 758, 769 (2013) (reversing trial court judgment when instruction required a motivating factor instead of a substantial-motivating factor). The court further decided that if an employer demonstrated the decision would have been made in any event, that would not be a complete defense, but the plaintiff would still be entitled to injunctive relief and attorney’s fees. 152 Cal.Rptr.3d 392, 294 P.3d at 68. In other words, the court adopted, through judicial decision, the approach in the Civil Rights Act of 1991 modifying Price Water-house. See also King v. Cowboy Dodge, Inc., 357 P.3d 755 (Wyo. 2015) (rejecting Nassar and adopting a “substantial and motivating” test, borrowed largely from workers’ compensation retaliation cases).
Some state courts, however, have adopted the very stringent but-for test for retaliation claims. For example, in Ash-bury University v. Powell, the Kentucky Supreme Court summarized the majority argument in Nassar and accepted it under Kentucky law. 486 S.W.3d 246, 254-55 (Ky. 2016). Similarly, in Navy, the court de- *633 dared, with little analysis, that there must be a substantial factor, and not just a causal link, supporting any retaliation claim. 407 S.W.3d at 899; see also Wholf v. Tremco Inc., 26 N.E.3d 902, 908 (Ohio Ct. App. 2016) (noting Ohio civil rights statute “modeled after Title VII” and embracing the reasoning of the Nassar. majority). In Gorree v. United Parcel Service, Inc., a Tennessee appellate court applied the but-for test of Nassar in a retaliation case, noting the legislature in Tennessee intended Tennessee law “to be coextensive with federal law.” 490 S.W.3d 413, 439 (Tenn. Ct. App. 2016). None of these eases discussed the impact of the 1991 Civil Rights Act nor the unique legislative history behind Title VII compared to state civil rights statutes.
E. Iowa Caselaw on Causation Under ICRA.
1. Generally applicable causation standard for status-based discrimination. Our most recent exploration of causation in a claim of status-based discrimination was DeBoom v. Raining Rose, Inc., 772 N.W.2d 1, 13 (Iowa 2009). In DeBoom, we emphasized the causation test for status-based discrimination under the ICRA was not “the determining factor” test but rather “a determining factor” test. Id. at 13-14 (emphasis added). We further noted it was sufficient to show that status-based discrimination' “played a part in the Defendant’s later actions toward Plaintiff.” Id. at 13.
2. Causation in retaliation cases. In Hulme v. Barrett (Hulme II), 480 N.W.2d 40, 42 (1992), we briefly considered the question of proof in a retaliatory discharge case/ In Hulme II, we declared in a brief paragraph that the causation standard for retaliation claims under the ICRA was a “high one.” Id. Citing one case from the Sixth Circuit but offering no analysis, we declared the “causal connection” required for a retaliation claim must be a “significant factor” motivating the adverse employment decision. Id. Notably, we used both the term “significant” and the term “motivating” to describe the causation requirement. Id. After having stated that causation must be a significant factor motivating the adverse employment decision, we then cited another case from the Eighth Circuit applying a substantial-factor test. M; see Womack, 619 F.2d at 1297.
We returned to the causation question for retaliation claims in City of Hampton v. Iowa Civil Rights Commission, 554 N.W.2d 532 (Iowa 1996). The brief discussion of causation in City of Hampton was dicta as no argument regarding level of causation was presented to the Iowa Civil Rights Commission. See id. at 535-36. In City of Hampton, we cited Hulme II for the proposition that hi retaliation cases, eausation is established by a “significant factor” motivating the adverse employment decision. Id. We did not cite the motivating-factor language in Hulme II. We again cited the Womack case, but this time for the proposition that the Eighth Circuit had established a but-for test and not a substantial-factor test as suggested in Hulme II. Id. We also cited, without elaboration, a Sixth Circuit case under Michigan law supporting a significant-factor standard. Id. (citing Polk v. Yellow Freight Sys., Inc., 801 F.2d 190 (6th Cir. 1986)).
In Hulme II and City of Hampton, we did not review the underlying statutory text of the ICRA. We did not engage in a reasoned discussion of the available interpretative. options. We did not consider the impact of Iowa Code section 216.18(1) requiring that we “broadly interpret the act to effectuate its purposes.” In fact, there is no analysis at all, only ambiguous and inconsistent declarations regarding a *634 substantial-factor test and a motivating-factor test.
F. Analysis. I begin the discussion of causation with consideration of the proper level of causation required to sustain a retaliation claim. Under the unified ICRA, the legislature has used the same term for causation for both status-based discrimination and retaliation claims, namely, the familiar “because” and “because of’ language. Iowa Code §§ 216.6(l)(a), .11(2). Two conclusions may be drawn from the use of the “because” and “because of’ causation language in both the status-based and the retaliation sections of the ICRA.
First, there is a strong textual argument that the level of causation for status-based claims and retaliation claims should be the same. We have frequently said that when the same term appears multiple times in the same statute, it should have the same meaning. State v. Paye, 866 N.W.2d 1, 7 (Iowa 2015); accord Carson v. Roediger, 513 N.W.2d 713, 716 (Iowa 1994); State v. Johnson, 604 N.W.2d 669, 672 (Iowa Ct. App. 1999). This familiar rule has been applied repeatedly in the context of civil rights statutes. See, e.g., EEOC v. Fry’s Elecs., Inc., 770 F.Supp.2d 1168, 1171 (W.D. Wash. 2011); Patino v. Birken Mfg. Co., 304 Conn. 679, 41 A.3d 1013, 1041 (2012); San Antonio v. Baer, 100 S.W.3d 249, 253 (Tex. App. 2001); see generally 3B Norman J. Singer & Shambie Singer, Statutes and Statutory Construction § 76.9, at 205 & n. 11 (7th ed. 2011).
Further, there is no policy reason to question the legislative judgment to use nearly identical causation language, thereby implying the same level of causation for retaliation claims as well as for status-based discrimination. As indicated above, retaliation claims are not second-class citizens, but are critical to effective enforcement of the ICRA. Policy reasons do not provide a basis for overriding the legislature’s textual choice.
Indeed, status-based discrimination and retaliation claims are two halves of the same walnut. The success of each depends upon the efficacy of the other. Nassar, 570 U.S. at -, 133 S.Ct. at 2531. Retaliation for complaining about discrimination is tightly bonded to the core prohibition and cannot be disassociated from it. Id. Thus, in addition to the textual argument based upon common use of the because-of causation standard in both status-based discrimination claims and retaliation provisions under the ICRA, there is also a strong functional argument for utilizing the same legal standard. Indeed, the United States Supreme Court, prior to its innovation in Nassar, repeatedly held that retaliation was a type of status discrimination. See Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 174, 125 S.Ct. 1497, 1504, 161 L.Ed.2d 361 (2005).
This approach represents a refinement, perhaps, of the standard for retaliation claims under the ICRA used in Hulme II and City of Hampton. In these cases, we applied a substantial-factor test for retaliation claims under the ICRA. City of Hampton, 554 N.W.2d at 535-36; Hulme II, 480 N.W.2d at 43. I do not believe there is a great difference between the substantial-factor test in Hulme II and City of Hampton and the motivating-factor or played-a-part test in DeBoom. But to the extent there is any distance between the two standards, this case presents an opportunity to close that distance.
By adopting a unified approach to status-based and retaliation causation, we would avoid juror confusion. We would avoid what Justice Ginsberg noted would be the result in Nassar, namely, that different causation standards would cause jurors to “puzzle over the rhyme or reason for the dual standards.” 570 U.S. at -, *635 133 S.Ct. at 2535. Such a double standard would be “virtually certain to sow confusion” in its practical application. Id. at -, 133 S.Ct. at 2546. The different standards are made even more problematic by the fact that the status-based and retaliatory conduct will have an overlapping or “symbiotic relationship,” as Justice Ginsberg suggested. Id. at -, 133 S.Ct. at 2535. Retaliation is simply another form of sex discrimination. Jackson, 544 U.S. at 174, 125 S.Ct. at 1504. I would thus conclude the motivating-factor or played-apart test that applies for status-based discrimination should also apply in retaliation claims under the ICRA.
In reaching this conclusion, I note the Nassar case has no bearing in the interpretation of the ICRA. The legislative history behind the status-classification and retaliation provisions of Title VII discussed in Nassar is fundamentally different than the legislative history behind the ICRA. Nassar relied extensively on the difference in congressional language between causation for status-based claims and causation for retaliation claims that arose after the enactment of the Civil Rights Act of 1991. 570 U.S. at -, 133 S.Ct. at 2529 (majority opinion).
In light of the Civil Rights Act of 1991, the text of Title VII is now fundamentally different than the text of the ICRA with respect to the causation requirements in status-based and retaliation cases. Under Title VII, the motivating-factor test was explicitly incorporated into status-based discrimination, but the same change was not introduced into the retaliation section of Title VTI. Here, our caselaw has defined causation in the status-based discrimination clause as being a motivating factor and the same causation language is used in the retaliation section of the ICRA. The reasoning of Nassar is thus completely inapplicable here.
Aside from the markedly different legislative history, I would reject Nassar for other reasons. In particular, I am unpersuaded by the notion that higher standards for a retaliation claim are required in light of the number of complaints filed with the EEOC. At the outset, it is odd that a provision of substantive law should be affected by the number of administrative complaints made to an agency responsible under a statute to adjust such claims. If the number of claims decreases to a trickle, does that provide a basis for lessening the substantive standards? Can it be that a substantive legal standard expands and contracts based upon its use?
Further, it makes no sense to limit relief for very substantial and powerful claims, like those in Nassar, in order to also limit frivolous claims. Other tools are available. A. charge of discrimination may be filed under the ICRA only under penalty of perjury. A court may award attorneys’ fees as a sanction for claims brought in bad faith. Attorneys who file false claims are subject to ethical sanctions. See generally Sandra F. Sperino & Suja A. Thomas, Fakers and Floodgates, 10 Stan. J. C.R. & C.L. 223, 228 (2014). Further, there is no evidence that a heightened standard of causation would deter false claims. A person willing to file a false claim is not likely to be affected by a higher substantive causation standard.
Further, the mere existence of an increase in EEOC claims is not a powerful empirical tool. The executive branch, through an amicus brief filed by the United States Department of Justice, did not advance the argument and supported the lower motivating-factor standard for discrimination claims. See Brief for the United States as Amicus Curiae Supporting Respondent at 7, Nassar, 570 U.S. -, 133 S.Ct. 2517, 186 L.Ed.2d 503, 2013 WL 1462056, at *7, (No. 12-484). Further, the *636 EEOC—through its guidelines—advocated a motivating-factor standard. U.S. Equal Emp’t Opportunity Comm’n, EEOC Compliance Manual: EEOC Directives Transmittal No. 915.003 (May 20, 1998), https:// web.archive.org/web/20040109231351/ https://www.eeoc.gov/policy/docs/retal.html [hereinafter EEOC Manual 1998 Update] (replacing section 614 in the 1991 Manual); see also 2 U.S. Equal Emp’t Opportunity Comm’n, EEOC Compliance Manual § 614.3(e), at 614-10 (Dec. 1, 1991) (stating the protected action must be “at least a factor” in the retaliation). Thus, the agency principally responsible for dealing with workplace discrimination, the EEOC, did not raise the argument itself about filing of frivolous claims and siphoning of its resources.[32]
The majority in Nassar believed it was in a better position to judge the administrative impact of substantive retaliation law on filings. See 570 U.S. at ——, 133 S.Ct. at 2531-32. Yet, the Nassar Court had no evidence of the reasons for the increase in retaliation claims. The increase in claims may reflect an increased awareness of the availability of remedies. And, the failure to report civil rights claims for fear of retaliation may well continue to be an intractable problem that should not be exacerbated by imposing a higher substantive law standard on causation. See Deborah L. Brake & Joanna L. Grossman, The Failure of Title VII as a Rights-Claiming System, 86 N.C. L. Rev. 859, 897-900 (2008); Deborah L. Brake, Retaliation, 90 Minn. L. Rev. 18, 25-26 (2005) [hereinafter Brake, Retaliation]; Laura Beth Nelson & Robert L. Nelson, Rights Realized? An Empirical Analysis of Employment Discrimination Litigation as a Claiming System, 2005 Wis. L. Rev. 663, 673-75 (2005). As noted in Crawford v. Metropolitan Government of Nashville & Davidson County, “[fjear of retaliation is the leading reason why people stay silent instead of voicing their concerns about bias and discrimination.” 555 U.S. 271, 279, 129 S.Ct. 846, 852, 172 L.Ed.2d 650 (2009) (quoting Brake, Retaliation, 90 Minn. L. Rev. at 20). The higher standard is inconsistent with the unfettered access to the remedial system espoused in Smith v. Jackson, 544 U.S. 228, 233, 125 S.Ct. 1536, 1540-41, 161 L.Ed.2d 410 (2005).
In the end, once the Nassar rhetoric is examined, the majority appears to have been motivated by “zeal to reduce the number of retaliation claims filed against employers.” 570 U.S. at -, 133 S.Ct. at 2547 (Ginsberg, J., dissenting). The lowered protection from retaliation will tend to defeat the early reporting of harassment claims and their prompt adjustment. Ernest F. Lidge, III, The Necessity of Expanding Protection from Retaliation for Employees Who Complain About Hostile Environment Harassment, 453 U. Louisville L. Rev. 39, 56 (2014). The approach in Nassar is inconsistent with the observation in Burlington Northern that “[interpreting the antiretaliation provision to provide broad protection from retaliation helps ensure the cooperation upon which accomplishment of the Act’s primary objective depends.” 548 U.S. at 67, 126 S. Ct. at 2414. And certainly the flavor of the *637 majority opinion in Nassar does not reflect the command of Iowa Code section 218.1(2) to broadly construe provisions of the ICRA.
Based on the above reasoning, we conclude the reasoning of Nassar should be rejected under the ICRA. The “because of’ language in the status-based discrimination provision of the ICRA should be interpreted the same as the “because of’ language for retaliation claims.
We have not used identical language in our past cases dealing with causation in retaliation cases. In Hulme II, 480 N.W.2d at 43, and City of Hampton, 554 N.W.2d at 535, we used the substantial-factor language, but in DeBoom, 772 N.W.2d at 13, we employed the motivating-factor or played-a-part test.
There are two ways to address the apparent difference in the language of our cases. One is to simply state that the difference in language in the cases inconsequential and that the instruction in this case was sufficient on the law. That is the position taken by a commentator after review of the disparate federal caselaw of retaliation causation. Martin J. Katz, The Fundamental Incoherence of Title VII: Making Sense of Causation in Disparate Treatment Law, 94 Geo L.J. 489, 507-10 (2006) (indicating there is no difference between “substantial factor” and “motivating factor” formulations but, as between the two, endorsing an “a factor,” “a role,” or “a motivating factor” formulation.). To the extent there is a difference, however, we would go with our more recent formulation in DeBoom, 772 N.W.2d at 13, where the issue of level of causation was a contested issue, and not with the older approach in Hulme II, 480 N.W.2d at 43, and City of Hampton, 554 N.W.2d at 535, where the question of level of causation was not disputed by the parties. The De-Boom causation test, to the extent it is different than the approach in Hulme- II and City of Hampton, is more protective of the channels of communication that are so essential to the effective enforcement of the ICRA. .
V. Instructions Regarding “Materially Adverse Action” in Retaliation Cases.
A. Overview of Issue. Neither- the ICRA nor federal statute requires a plaintiff make a showing of a “materially adverse action” in order to support a retaliation claim. Nonetheless, the United States Supreme Court has grafted such a requirement onto Title VII and many courts have followed the Supreme Court’s lead. See Burlington Northern, 548 U.S. at 68, 126 S.Ct. at 2415 (“In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse.... ”); Rachel K. Alexander, Taking the Detour Around Defending Protected Activity: How Burlington Northern v. Santa Fe Railway Co. v. White Unnecessarily Complicates Litigation of Retaliation Claims, 27 Rev. Litig. 333, 350-52 (2008) (describing that the materially-adverse-action standard has been read into state antidiscrimination statutes by courts).
The parties in this case do not contest the basic proposition that a plaintiff in a retaliation case must show materially adverse action. The question is, instead, whether the trial court’s instructions accurately described adverse action necessary to support a retaliation claim under the ICRA.
B. Challenged Trial Court Instructions. The district court’s instruction defined “adverse actions” required to support a retaliation claim under the ICRA as follows:
[A]ny action which has material consequences to an employee. It is -anything *638 that might dissuade a reasonable person from making or supporting an allegation of discrimination or harassment.
It includes' but is not limited to such employment actions as constructive discharge, reprimands or other threats of ■reprimands, a change in opportunities, false accusations or complaints, being investigated, being placed on performance improvement plan, being placed on probation or other actions which adversely affect or undermine the position of the employee. It also includes an employer seeking out negative feedback on an employee or condoning or encouraging other employees to complain about her. You should judge whether an action is sufficiently adverse from the point of view of a reasonable person in the plaintiffs positions.
(Emphases added.)
HES had offered the following instruction on adverse action:
[A]n “adverse employment action” is an action that detrimentally affects the terms, conditions, or privileges or employment. Changes in duties or working conditions that cause no materially significant disadvantage to the employee are not adverse employment actions. It includes, but is not limited to, employment actions such as termination of employment, failure to promote, or any action that would discourage a reasonable employee from making a complaint of harassment. Giving an employee a performance improvement plan or negative employment review is not “adverse employment action” unless they are later used as a basis to alter the employee’s terms or conditions of employment in a detrimental way. Both the action and its context must be examined.
C. Positions of the Parties. HES asserts the district court’s instruction was inaccurate because it includes actions which do not “materially significantly disadvantage” the employee. According to HES, no court has ever found the actions italicized in the instructions to amount to an adverse employment action.
Haskenhoff notes the first paragraph of the instruction provides that in order to be an adverse action, the action must have “material consequences” for the employee. Further, the jury found Haskenhoff was constructively discharged. Thus, the jury plainly found there was a legally sufficient adverse action by the employer. As a result, to the extent the instruction is flawed, Haskenhoff argues it is harmless.
D. Federal Caselaw and EEOC Authority on Scope of “Materially Adverse Action” in the Context of Retaliation Claims.
1. Introduction. With respect to retaliation, Title VII states that it is an unlawful employment practice for an employer “to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation proceeding or hearing under this subchapter.” 42 U.S.C. § 2000e-3(a). The phrase “to discriminate” is not defined by the statute. Congress left that question for the courts. Unlike the status-discrimination provision of Title VII, however, the retaliation provision does not contain the phrase “terms, conditions, or privileges of employment.” 42 U.S.C. § 2000e-2(a). The presence of the phrase “terms, conditions, or privileges of employment” in the status-discrimination section of Title VII, when it is excluded in the retaliation provision,, gives rise to the inference that Congress has made a deliberate choice.
2. EEOC 1998 guidelines. The EEOC has confronted the question of what consti *639 tutes adverse action sufficient to support a retaliation claim under Title VII in revisions to its compliance manual issued in 1998. See EEOC Manual 1998 Update. According to the EEOC, while the “most obvious types of retaliation are denial of promotion, refusal to hire, denial of job benefits, demotion, suspension, and discharge” retaliation can also include “threats, reprimands, negative evaluations, harassment, or other adverse treatment.” Id.; see EEOC v. Bd. of Governors of State Colls. & Univs., 957 F.2d 424 (7th Cir. 1992); Christopher v. Strouder Mem’l Hosp., 936 F.2d 870, 873-74 (6th Cir. 1991); Johnson v. Palma, 931 F.2d 203 (2d Cir. 1991).
The EEOC, however, rejected the “ultimate employment action” test adopted by the Eighth Circuit in Ledergerber v. Stangler, 122 F.3d 1142 (8th Cir. 1997), and the “terms and conditions of employment” test embraced by the Fourth Circuit in Munday v. Waste Management of North America, 126 F.3d 239 (4th Cir. 1997). EEOC Manual 1998 Update. According to the EEOC, such tests were “unduly restrictive.” Id. While the EEOC recognized that “petty slights and trivial annoyances are not actionable,” it stressed the degree of harm suffered by the individual “goes to the issue of damages, not liability.” Id. (quoting Hashimoto v. Dalton, 118 F.3d 671, 676 (9th Cir. 1997)).
The EEOC justified its approach based on text and policy. On text, the EEOC emphasized that while the status discrimination of Title VII states it is unlawful to discriminate against a person with respect to “terms, conditions, or privileges of employment,” the retaliation provision of Title VII has no such limitation. EEOC Manual 1998 Update] see 42 U.S.C. § 2000e-2.
On policy, the EEOC emphasized the primary purpose of the antiretaliation provisions is to “maintain[ junfettered access to the statute’s remedial mechanisms.” EEOC Manual 1998 Update-, see also Robinson v. Shell Oil Co., 519 U.S. 337, 345, 117 S.Ct. 843, 848, 136 L.Ed.2d 808 (1997). According to the EEOC, an interpretation of Title VII “that permits some forms of retaliation to go unpunished would undermine the effectiveness of the EEOC statutes and conflict with the language and purpose of the anti-retaliation provisions.” EEOC Manual 1998 Update] see generally Joel A. Kravetz, Deterrence y. Material Harm: Finding the Appropriate Standard to Define an “Adverse Action” in Retaliation Claims Brought Under the Applicable Equal Employment Opportunity Statutes, 4 U. Pa. J. Lab. & Emp. L. 315, 355-65 (2002).
3. The Burlington Northern case. Prior to the seminal United States Supreme Court case of Burlington Northern, the federal courts splintered on the question of what a plaintiff must show to support a retaliation claim under Title VII.
In Ray v. Henderson, the Ninth Circuit outlined the differing approaches to retaliation claims in the various circuits. 217 F.3d 1234, 1241-42 (9th Cir. 2000). According to Ray, the First, Seventh, Tenth, Eleventh, and D.C. Circuits all “take an expansive view” of the type of actions that can be considered adverse- employment actions. Id. at 1241; see Wideman v. Wal-Mart Stores, 141 F.3d 1453, 1456 (11th Cir. 1998); Knox v. Indiana, 93 F.3d 1327, 1334 (7th Cir. 1996); Corneveaux v. CUNA Mut. Ins. Grp., 76 F.3d 1498, 1507 (10th Cir. 1996); Wyatt v. Boston, 35 F.3d 13, 15-16 (1st Cir. 1994); Passer v. Am. Chem. Soc., 935 F.2d 322, 330-31 (D.C. Cir. 1991). In contrast, Ray cited the Second and Third Circuits as holding adverse action is something that “materially affects the terms and conditions of employment.” 217 F.3d at 1242; see Robinson v. Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997); Torres v. *640 Pisano, 116 F.3d 626, 640 (2d Cir. 1997). Finally, the Ray court noted the Fifth and Eighth Circuits had adopted the most restrictive test, namely, the “ultimate employment action” test which required actions such as hiring, firing, promoting, and demoting to support a retaliation claim. 217 F.3d at 1242; see Mattern v. Eastman Kodak Co., 104 F.3d 702, 707 (5th Cir. 1997); Ledergerber, 122 F.3d at 1144.
In 2006, the Supreme Court entered the fray in Burlington Northern, 548 U.S. at 53, 126 S.Ct. at 2405. Under Burlington Northern, a plaintiff must show an employment action is materially adverse, “which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.” Id. at 68, 126 S.Ct. at 2415. In so concluding, the court rejected the “terms, conditions, or benefits” and the “ultimate employment decision” standards percolating through the federal courts in the Second, Third, Fifth, and Eighth Circuits. Id. at 61-63, 126 S.Ct. at 2411-12.
In Burlington Northern, the Supreme Court adopted a general, functional approach to the retaliation provision of Title VII. See id. at 68, 126 S.Ct. at 2415. The Burlington Northern Court tied material adversity directly to the purpose of the retaliation provision of Title VII—encouraging unfettered access to Title VII. Id. at 62-63, 126 S.Ct. at 2411-12. In determining whether the employer’s action “might well have dissuaded a reasonable worker from making or supporting a charge of discrimination,” the Court instructed that the question be determined from “the perspective of a reasonable person in the plaintiffs position under all the circumstances.” Id. at 71, 126 S.Ct. at 2417. Under Burlington Northern, trial courts are required to examine the specific facts from someone in the plaintiffs position, a highly individualized inquiry. See id.
Thus, as the Burlington Northern Court repeatedly emphasized, “context matters” because an “act that would be immaterial in some situations is material in others.” Id. at 69, 126 S.Ct. at 2416. The Supreme Court emphasized “the significance of any given act of retaliation will often depend upon the particular circumstances.” Id. The inquiry is fact specific to the workplace and to the individual pressing the retaliation claim. Id. The plain implication is that except in the most marginal of cases, because of their fact intensive nature, retaliation claims should survive summary judgment.
4. Posi-Burlington Northern federal caselaw. Burlington Northern was something of a bombshell in the employment law world. As a general matter, there seemed to be little question that under Burlington Northern, more retaliation cases would survive summary judgment. Further, most of the post-Burlington Northern federal caselaw recognized that in determining whether a plaintiff has suffered disparate treatment, the “terms, conditions, and privileges of employment” test was not applicable in retaliation cases. The lower federal courts widely came to recognize that in retaliation cases, a lesser standard applies. See Powell v. Lockhart, 629 F.Supp.2d 23, 41 (D.D.C. 2009) (holding that placing employee on performance improvement plan was insufficient to support disparate treatment claim, but could support retaliation claim because of lesser standard).
Burlington Northern emphasized the proper test for a retaliation case was “material adverse action” which “well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.” 548 U.S. at 68, 126 S.Ct. at 2415. This feature of Burlington Northern appears to be lost in some of the cases, which seem to require tangible impact on “terms, *641 conditions, and privileges of employment.” See Sutherland v. Mo. Dep’t of Corrs., 580 F.3d 748, 752 (8th Cir. 2009) (rejecting adverse employment action when plaintiff “had no reductions in pay, salary, benefits, or prestige”). And, in other cases, the test applied by the courts seems to be too high. For example, in Deleon v. Kalamazoo County Road Commission, the Sixth Circuit suggested in a retaliation case that the question was whether a reassignment without loss of pay was “objectively intolerable” to a reasonable person. 739 F.3d 914, 919 (6th Cir. 2014). This formulation seems to be more demanding than a Burlington Northern standard where the plaintiff must show that a reasonable person “might well have been deterred” from supporting or filing a charge.
Many post -Burlington Northern cases recognize that the totality of the circumstances must be considered when the “might well have deterred” standard is applied and bright-line declarations about whether certain actions were sufficient or insufficient were generally inappropriate under Burlington Northern. For example, following Burlington Northern, the Fifth Circuit in Thompson v. Waco, held that a change in job responsibilities did not automatically qualify as an adverse impact, but it could be adverse action depending upon a jury’s view of the facts. 764 F.3d 500, 504-05 (5th Cir. 2014).
A related concept is that certain actions individually might not be sufficient, but cumulatively such actions may arise to adverse action for purposes of supporting a retaliation claim. For example, in Sanford v. Main Street Baptist Church Manor, Inc,, the Sixth Circuit recognized that although some of the incidents might not rise to the level of adverse action, “the incidents taken together might dissuade a reasonable worker from making or supporting a discrimination charge.” 327 Fed.Appx. 587, 599 (6th Cir. 2009); see also Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 90 (2d Cir. 2015) (finding combination of being assigned absent students, temporary paycheck reduction, and failure to notify of curriculum claim cumulatively amount to “material adverse action”); Alvarado v. Fed. Express Corp., 384 Fed.Appx. 585, 589 (9th Cir. 2010) (holding delayed paychecks, denial of personal time, criticism of work performance, and shift change were adverse actions); Shannon v. BellSouth Telecomm., Inc., 292 F.3d 712, 715-16 (11th Cir. 2002) (stating reassignment alone is not adverse action, but reassignment, together with denial of overtime and allocation of a more difficult assignment in an unairconditioned van, amounted to adverse action); Ridley v. Costco Wholesale Corp., 217 Fed.Appx. 130, 135 (3d Cir. 2007) (holding while jury verdict finding demotion was not retaliatory^' combination of other events after demotion, including transfer to warehouse, counseling notices for minor incidents, and failure to investigate these incidents satisfied Burlington Northern test); see generally Joan M. Savage, Adopting the EEOC Deterrence Approach to the Adverse Employment Action Prong in Prima Facie Case for Title VII Retaliation-, 46 B.C. L.-Rev. 215, 235-36 (advocating broad case-by-case approach).
Burlington Northern recognized that petty slights, minor annoyances, and simple lack of good manners is not enough to establish material adverse action to support a retaliation- claim. Some federal courts have regarded this declaration as an invitation to take a laundry-list approach and declare, as a matter of law, that certain types of actions never amount to mar terial adverse actions. Other federal cases, however,, are more sensitive to context.
5. EEOC August 201-6 enforcement guidelines on .retaliation and related issues. In August 2016, the Equal Employ *642 ment Opportunities Commission issued its “Enforcement Guidelines on Retaliation and Related Issues,” superseding its previous guidance in 1998. See EEOC Enforcement Guidance on Retaliation and Related Issues (Aug. 25, 2016), https://www. eeoc.govfiaws/guidance/retaliation-guidance.cfm [hereinafter EEOC Enforcement Guidance]. The new guidelines generally embraced Burlington Northern and provided the commission’s view of retaliation claims in a post-Burlington Northern world. Id. II.B.l.
Among other things, the EEOC emphasized that combinations of incidents could cumulatively amount to a material adverse action even if the individual incidents, considered alone, might not qualify. Id. The EEOC further emphasized that under Burlington Northern, potential retaliatory incidents must be considered in context and not in isolation. Id.
The EEOC addressed the question of what type of actions might rise to the level of a material adverse action. Id. II.B.2. According to the EEOC, “[t]he most obvious types of adverse actions are denial of promotion, refusal to hire, denial of job benefits, demotion, suspension, and discharge.” Id. But the EEOC went on to say,
Other types of adverse actions may include work-related threats, warnings, reprimands, transfers, negative or lowered evaluations, transfers to less prestigious or desirable work or work locations, and any other types of adverse treatment that in the circumstances might well dissuade a reasonable person from engaging in protected activity.

Id.

The EEOC concluded the determination of whether a plaintiff has made the necessary showing of material adverse action to support a retaliation claim was fact driven. Id. According to the EEOC,
A fact-driven analysis applies to determine if the challenged employer action(s) in question would be likely to deter participation or opposition. To the extent some lower courts applying Burlington Northern have found that some of the above-listed actions can never be significant enough to deter protected activity, the Commission concludes that such a categorical view is contrary to the context-specific analysis, broad reasoning, and specific examples endorsed by the Supreme Court.

Id.

The EEOC also addressed the question of whether a materially adverse action required harm to the employee. Id. The EEOC concluded it did not. Id. According to the EEOC, the degree of harm suffered by the individual “goes to the issue of damages, not liability.” Id. (quoting Hashimoto v. Dalton, 118 F.3d 671, 675 (9th Cir. 1997)).
Finally, the EEOC distinguished between the standard required to prove a hostile environment claim and the standard to show retaliation. Id. As noted by the EEOC, “[t]he threshold for establishing retaliatory harassment is different than for discriminatory hostile environment.” Id. II.B.3.
According to the EEOC, harassment sufficient to support a retaliation claim does not need to be severe or pervasive enough to alter the terms and conditions of employment. Id.
E. State Caselaw on Retaliation Requirements. Neither party cited any state caselaw on the question of what constituted adverse action sufficient to support a retaliation claim. We have been able to discern no clear pattern in the state case-law.
Some state cases recognize the impact of Burlington Northern. For instance, in Donovan v. Broward County Board of *643 Commissioners, a Florida court of appeals recognized that Burlington Northern found the ordinary approach to discrimination cases too limiting in the context of retaliation claims. 974 So.2d 458, 461 (Fla. Dist. Ct. App. 2008). The Donovan court applied the broadened Burlington Northern standard. Id.
Another case that employs Burlington Northern contextualization is Ellis v. Jungle Jim’s Market, Inc., 44 N.E.3d 1034 (Ohio Ct. App. 2013). In Ellis, an employee was transferred from the seafood department into a bagging position after' reporting workplace harassment. Id. at 1052. The plaintiff produced evidence that the transfer significantly diminished her job responsibilities and that she would learn fewer skills in the bagging position. Id. at 1053-54. The Ohio court held that she raised an issue of fact with respect to whether the transfer amounted to a “material adverse action” by her employer. Id. at 1054.
Similarly, in Hoffelt v. Illinois Department of Human Rights, a plaintiff claiming retaliation offered evidence that she was called names and treated in a demeaning manner, was assigned to a position known as “a punishment post,” and had her requests for compensatory leave denied under circumstances in which they were granted in the past. 367 Ill.App.3d 628, 310 Ill.Dec. 701, 867 N.E.2d 14, 21 (2006). Citing Burlington Northern, the Illinois court concluded that under the circumstances, she “well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.” Id., 310 Ill.Dec. 701, 867 N.E.2d at 20.
Another state court has emphasized the need to broadly construe the retaliation provision in its civil rights legislation. In Albunio v. City of New York, the court emphasized the retaliation provision would be construed “broadly in favor of discrimination plaintiffs, to the extent.such a construction is possible.” 16 N.Y.3d 472, 922 N.Y.S.2d 244, 947 N.E.2d 135, 137 (2011); see also Roa v. Roa, 402 N.J.Super. 529, 955 A.2d 930, 938 (2008) (adopting Burlington Northern approach). At least one state court, however, has characterized the Burlington Northern inquiries as ordinarily posing questions of law. In Montgomery County v. Park, the Texas Supreme Court held that changes in a job position did not support a retaliation claim. 246 S.W.3d 610, 615-16 (Tex. 2007).
F. Iowa Caselaw on “Adverse Employment Action.” We have considered the meaning of “adverse employment action” [33] in a limited number of cases. In most of them we have indicated what the vague term “adverse employment action” might include, not what it excludes. In the pre-Burlington Northern case of Channon v. United Parcel Service, Inc., we noted that “[a] wide variety of actions, some blatant, some subtle,” can qualify as “adverse employment actions.” 629 N.W.2d 835, 863 (Iowa 2001). Indeed, we have indicated that whether an adverse employment action occurred “will normally depend on the facts of each situation.” Id. at 862. This fact-specific language is consistent with the strain in the federal law that recognizes, as did Burlington Northern, that the determination is to be made under all of the facts and circumstances. See 548 U.S. at 71, 126 S.Ct. at 2417. We cited with approval cases that found loss of title and committee assignments, transfers, and reduction of supervisor status as amounting *644 to “adverse employment actions.” Channon, 629 N.W.2d at 863-64.
Yet, we have indicated that “[cjhanges in duties or working conditions that cause no materially significant disadvantages to the employee are not adverse employment actions.” Id, at 862. Of course, the Channon formulation that an “adverse employment action” must be a “materially significant disadvantage,” id,, is somewhat circular and not very helpful. And, it is inconsistent with the Burlington Northern standard. In Channon, however, we concluded when the plaintiff offered evidence tending to show she faced ridicule, a constructive demotion, and open hostility about her lawsuit, the record was sufficient to support a finding of adverse employment action. Id. at 866.
The next pre-Burlington Northern Iowa retaliation case is Estate of Harris, 679 N.W.2d 673. In that case, the district court rather remarkably concluded that a punch to the chest delivered by a supervisor that ultimately killed the employee was not an “adverse employment action” sufficient to support a retaliation claim. Id. at 676. We reversed, noting, it was for the jury to determine whether the action was simply an act of machismo or should be considered something more sinister. Id. at 679.
In our analysis in Estate of Harris, we favorably cited a federal district court case for the proposition that moving an employee to an isolated' corner might be sufficient to support.a retaliation claim. Id. at 678; see Harris v. Richards Mfg. Co., 511 F.Supp. 1193, 1203 (W.D. Tenn. 1981), aff'd in part and rev’d in-part, 675 F.2d 811 (6th Cir. 1982). We further cited Ray, 217 F.3d 1234, for the proposition that federal circuit courts were split on how. broadly to determine adverse . employment action.[34] Estate of Harris, 679 N.W.2d at 679. Nowhere in Estate of Harris, however, did we describe precisely what the appropriate standard was for determining an “adverse employment action” for purposes of a retaliation claim. . ,
Our last retaliatory discharge case is the pr e-Burlington Northern case of Boyle, 710 N.W.2d 741. In Boyle, the district court found against the plaintiff on the underlying harassment claim and appeared to believe this resolution rendered the plaintiffs alternative claim that she was discharged in retaliation for making her complaint moot. Id. at 750. We reversed. Id. at 752. In Boyle, however, we did not have occasion to explore the requirements of retaliatory discharge other than to emphasize that a retaliatory discharge claim did not depend upon the merits of the underlying complaint. Id.
On balance, we should recognize that our pr e-Burlington Northern adverse-employment-action cases did not have the benefit of Burlington Northern ⅛ key insight that the test for material adverse action in the context of' retaliation claim was whether a reasonable person would likely be deterred from utilizing complaint procedures, and not the familiar terms, conditions, and privileges of employment test that applies to disparate treatment cases. See 548 U.S. at 73,126 S.Ct. at 2417. Thus, cases like Channon embraced what *645 federal law now recognizes is the wrong test.
Although our cases reflect superseded federal law, they still generally recognized the subtlety of the workplace and the need to consider factual issues related to employment claims in light of the totality of facts and circumstances. See Channon, 629 N.W.2d at 862. Our cases further reflect the desirability of jury determinations of disputed factual issues in the retaliation context. See Estate of Harris, 679 N.W.2d at 678.
G. Discussion. At the outset, we are obliged to construe the ICRA broadly to effectuate its purposes. Iowa Code § 216.18(1). As has already been noted, maintaining clear channels for pursuing complaints is critical to the regime established by the ICRA. Cf. Robinson, 519 U.S. at 346, 117 S.Ct. at 848 (stating purpose of retaliation provision to maintain “unfettered access to statutory remedial mechanisms”).
The parties both accept the notion that we must determine what is a material adverse action for purposes of a retaliation claim under the ICRA. I have little hesitance in embracing the approach of Burlington Northern, the EEOC, and the better reasoned caselaw that the test is whether a reasonable employer might be deterred from filing a complaint by the conduct in question. The purpose of a retaliation claim is to keep the access to the channels of civil rights law clear and open. The test for retaliation should be tied to its fundamental purpose.
The test for material adverse action for purposes of retaliation is thus distinct from the test for an adverse employment action for purposes of a disparate-treatment claim. As stated by the EEOC, the question of tangible harm goes to damages, not to liability, for retaliatory conduct. To the extent our prior cases suggest otherwise, they should be overruled. I would thus specifically reject the approach of the' mostly pre-Burlington Northern Eighth Circuit cases that indicate a material adverse action must include tangible employment action or must affect terms and conditions of employment. See Scott Rosenberg & Jeffrey Lipman, Developing a Consistent Standard for Evaluating a Retaliation Case Under Federal and State Civil Rights Statutes and State Common Law Claims: An Iowa Model for the Nation, 53 Drake L. Rev. 359, 384-85 (2005) (urging adoption of Ninth Circuit standard in Ray). As stated by the EEOC, in addition to the most obvious adverse actions such as denial of promotion, refusal to hire, denial of job benefits, demotion, suspension and discharge,
[ojther types of adverse action may include work-related threats, warnings, reprimands, transfers, negative or lowered evaluations, transfers to less prestigious or desirable work or work locations, and any other types of adverse treatment that in the circumstances might well dissuade a reasonable person from engaging in protected activity.
EEOC Enforcement Guidance II B.2.
I would also agree with Burlington Northern, the EEOC, and the better reasoned caselaw that the determination of whether a plaintiff has introduced evidence sufficient to establish a material adverse action is fact specific and will, in most cases, generate a jury question. Of course, petty incidents in isolation do not suffice to show a materially adverse impact, but determining what is so petty that it would not deter a reasonable person from utilizing complaint procedures is usually best decided by a diverse jury with a mix of real world experience rather than by the court. Cf. Bell v. Johnson, 308 F.3d 594, 603-05 (6th Cir. 2002) (holding unless claimed retaliatory action is truly inconse *646 quential, the plaintiffs First Amendment claim should go to the jury); Gallagher v. Delaney, 139 F.3d 338, 342 (2d Cir. 1998) (noting that federal judges usually live “in a narrow segment of the enormously broad American socio-economic spectrum” and generally lack “the current real-life experience required in interpreting subtle sexual dynamics of the workplace, based on nuances, subtle perception, and implicit communications”).
We should embrace the notion that while each individual act might not provide sufficient evidence of a material adverse action, a combination of relatively petty slights poses a different issue. Ordinarily, the cumulative weight of multiple or repetitive actions will generate a fact question for the jury to determine. Sanford, 327 Fed.Appx. at 599; Vega, 801 F.3d at 90; Ridley, 217 Fed.Appx. at 135.
Finally, I would reject the laundry-list notion that various employment actions such as reprimands or negative job evaluations, transfers without loss of pay, or “snubbing” may be categorically regarded as never arising to the level of material adverse action. Take the negative job evaluation. In some, setting, a negative job evaluation might not matter at all. A negative job evaluation for an employee approaching retirement might produce a cynical grunt, but not much more. On the other hand, a negative job evaluation for an economically struggling head of household who is anxious to climb the work ladder to provide a better life for his or her family might reasonably feel quite different.[35] See, e.g., Walker v. Johnson, 798 F.3d 1085, 1095 (D.C. Cir. 2015) (holding denial of deserved rise in performance rating may be actionable); Porter v. Shah, 606 F.3d 809, 817-18 (D.C. Cir. 2010) (stating interim performance of “borderline unacceptable” not materially adverse when delivered orally, no written record was made, and was superseded by end of the year review); see generally EEOC Manual 1998 Update § 5.B.2 n.113. This is precisely the kind of contextualization called for in Burlington Northern, which noted that a transfer to a night shift would be inconsequential for some, but not for others.[36] Of course, an insistence on contextualization is a two-way street. It applies to plaintiffs as well as defendants.
In general, the first paragraph of the instruction accurately captures the test of material adverse action in the retaliation context. It emphasizes that material adverse action is action that is likely to deter a reasonable person from filing a complaint. That is the legal standard I would adopt under the ICRA.
The second paragraph of the instruction, however, is problematic. It offers the unqualified statement that material adverse action includes a list of actions. A reasonable jury could interpret the instruction to mean that if one of the listed actions is present, material adverse action is necessarily present as a matter of law, end of story. But, as stated above, the test is whether a reasonable person in the shoes of the plaintiff might well be deterred from pursuing a civil rights claim. In con *647 sidering this question, as Burlington Northern teaches us, “context matters.” Id. at 69, 126 S.Ct. at 2416. Though each of the listed actions, in context, separately or cumulatively, might rise to an “adverse material action” if it met the Burlington Northern test that it “might well deter” a reasonable person in the shoes of the plaintiff from engaging in protected activity, a jury is not compelled to make that finding as the trial court’s instruction might suggest. Id.
Ordinarily, this instructional error would be prejudicial and require vacation of the verdict and remand for a new trial. Hask-enhoff argues, however, that any error is cured by the jury’s verdict finding that Haskenhoff was constructively discharged by HES. Plainly, a constructive discharge amounts to a material adverse action. 1 Andrew J. Ruzicho et al., Employment Practices Manual § 6B:7, Westlaw (database updated Mar. 2017) (“An actual or constructive discharge remains the clearest example of an adverse action.”).
But, as pointed out in Chief Justice Cady’s concurrence, there is a problem with Haskenhoffs theory that the jury’s verdict on constructive discharge remedies any potential flaw in the instructions on retaliation. On questions number one and two, the jury answered in the affirmative that Haskenhoff proved her case of sexual harassment and retaliation respectively. On question number three, the jury answered in the affirmative the question of whether Haskenhoff was subject to constructive discharge. In response to question number four, the jury returned a general damage verdict of $100,000 for lost wages and benefits, $300,000 for emotional distress, and $1,000,000 for the present value of emotional distress.
While the jury did find a constructive discharge, it is not clear from the verdict form whether the jury’s constructive-discharge verdict was based upon the plaintiffs claim of sexual harassment found in question one or whether it was based on the plaintiffs claim of retaliation in question two. In order to cure the defect in the retaliation instruction, we must be able to conclude the jury found a causal relationship-protected activity giving rise to the retaliation claim and the constructive discharge.
From the jury verdict form, however, it is possible the jury believed sexual harassment in question one, and not retaliation in question two, was causally related to the constructive discharge. If so, the jury could have awarded part of the general award damages in this case based upon the faulty retaliation instruction. See Farmers’ Nat’l Bank of Oskaloosa v. Stanton, 191 Iowa 433, 438-39, 182 N.W. 647, 650 (1921). Further, we cannot say as a matter of law that Haskenhoff established a material adverse action which we have declared ordinarily involves a fact-based determination. As a result, I agree the judgment of the district court must be reversed and the matter remanded for a new trial.
VI. Instructions Regarding Constructive Discharge.
A. Overview of Constructive Discharge. The application of the constructive discharge doctrine to civil rights claims has been controversial. See Mark S. Kende, Deconstructing Constructive Discharge: The Misapplication of Constructive Discharge Standards in Employment Discrimination Remedies, 71 Notre Dame L. Rev. 39, 41-45 (1995) [hereinafter Kende] (“[B]y forcing discrimination victims to endure continuing discrimination, the constructive discharge approach [of a majority of federal courts] contravenes Title VH’s purposes.”).
In this case, however, the parties do not contest whether the doctrine of construe- *648 tive discharge applies but instead battle over the substantive contours of constructive discharge. In exploring constructive discharge, we recognized that while constructive discharge is generally a demanding doctrine, a too stringent constructive discharge test may simply be “a sophisticated means of providing undeserved protection to employers who discriminate.” Id. at 78.
B. Challenged Instructions on Constructive Discharge. The jury was instructed on constructive discharge as follows: “The employer need not really want the employee to quit.... ■ The employee must show that she was subjected to sexual harassment or retaliation which made her believe there was no chance for fair treatment at Homeland.”
HES had sought to instruct the jury that Haskenhoff had to show “the Defendant acted with the intent of forcing the Plaintiff to quit, or the Plaintiffs resignation was a reasonably foreseeable result of the Defendant’s actions.” Additionally, HES sought to instruct the jury as follows:
An employee cannot “quit and sue” and then claim to have been constructively discharged. Rather, the conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. In order to amount to a constructive discharge, adverse working conditions must be unusually “aggravated” or amount to a “continuous pattern” before the situation will be deemed intolerable. Generally speaking, a single, trivial or isolate act is insufficient to support a constructive discharge claim. Finally, conditions cannot be considered intolerable unless the employer has been given a reasonable chance to resolve the problem.
C. Positions of the Parties.
1. HES. HES asserts the constructive discharge instruction was erroneous because of the assertion that the employer “need not really want the employee to quit.” Further, HES claims the instruction improperly injected the subjective views of Haskenkoff into the issue. Further, HES, citing Van Meter Industrial v. Mason City Human Rights Commission, 675 N.W.2d 503, 511 (Iowa 2004), argues the district court erred in failing to instruct that “conditions will not be considered intolerable unless the employer has been given a reasonable chance to resolve the problem.” Finally, in a footnote, HES challenges the repeated reference to “fairness” in the instruction.
2. Haskenhoff. With respect to the instruction regarding the fact that “the employer need not really want the employee to quit,” Haskenhoff argues that this language is supported by Van Meter, 675 N.W.2d at 512. While the instruction did refer to fairness, Haskenhoff states the Van Meter case repeatedly referred to the concept of fair treatment. Id. at 511-12.
With respect to the question of whether the instruction was erroneous because of reference to her subjective feelings, Hask-enhoff notes the instructions, taken as a whole, repeatedly referred to the objective standard for constructive discharge. According to Haskenhoff, Instruction Nos. 33 and 34 dealing with constructive discharge contained no less than seven references to the reasonableness standard.
Haskenhoff also asserts that HES’s proposed instruction that “conditions will not be considered intolerable unless the employer has been given a reasonable chance to resolve the problem” was presented in the instructions. Haskenhoff notes the in *649 structions stated that the “conditions ... must be sufficiently extraordinary and egregious” that “adverse working conditions must be unusually ‘aggravated’ or amount to a ‘continuous pattern’ before the situation will be deemed intolerable,” and “a single, trivial, or isolated act is insufficient to support a constructive discharge claim.” In any event, Haskenhoff suggests that in light of the evidence the jury would not have found that the employer did not have a reasonable chance to resolve the issue under the evidence adduced at trial.
D. Federal Caselaw on Constructive Discharge.
1. Introduction. When applying the law of constructive discharge, it appears almost universally accepted that the test of whether there is a constructive discharge is whether working conditions are sufficiently intolerable that a reasonable person in the position of the employee would have felt compelled to resign. See 2 Christopher Bello, Litigating Wrongful Discharge Claims § 7.62 n.3, at 7-260 (2013— 2014 Cumulative Supp.) (collecting cases). The reasonable-person test is generally an objective test* but it is qualified by the notion that the reasonable person must be one “in the position of the employee.” Id.
2. Intent to create hostile environment. The federal cases under Title VII are split on the question of whether a plaintiff in a constructive discharge case must prove employer intent. The majority view is that constructive discharge occurs even if the employer did not intend to create the intolerable working conditions, See, e.g., Ramsey v. City & Cty. of Denver, 907 F.2d 1004, 1010 (10th Cir. 1990); Watson, v. Nationwide Ins., 828 F.2d 360, 361 (9th Cir. 1987); Alicea Rosado v. Garcia Santiago, 562 F.2d 114, 119 (1st Cir. 1977). On the other hand, some eases hold that employer intent must be proved. See, e.g., Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1354 (4th Cir. 1995); Yates v. Avco Corp., 819 F.2d 630, 636 (6th Cir. 1987); Junior v. Texaco, Inc., 688 F.2d 377, 379 (5th Cir. 1982).
3.Reasonable chance to work out the problem. The Eighth .Circuit has stated that an employee who quits without giving his or her employer a reasonable chance to work out a problem is not constructively discharged. Trierweiler v. Wells Fargo Bank, 639 F.3d 456, 460 (8th Cir. 2011); Vajdl v. Mesabi Acad. of KidsPeace, Inc., 484 F.3d 546, 553 (8th Cir. 2007). A similar approach has been embraced by the Fifth and Eleventh Circuits. Kilgore v. Thompson & Brock Mgt., Inc., 93 F.3d 752, 754 (11th Cir. 1996); Bozé v. Branstetter, 912 F.2d 801, 805 (5th Cir. 1990).
In Suders v. Easton, the Third Circuit held it was relevant whether the employee explored alternative avenues to resolve the alleged discrimination before resigning, but that “a failure to do so will not defeat a claim of constructive discharge.” 325 F.3d 432, 445-46 (3rd Cir. 2003), vacated on other grounds sub nom Pa. State Police v. Suders, 542 U.S. 129, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). Other federal circuits have found that the failure to attempt to resolve the.problem prior to quitting as only a factor to be considered by the fact finder in determining whether a constructive discharge is present. Lindale v. Tokheim Corp., 145 F.3d 953, 956 (7th Cir. 1998); Levendos v. Stern Entm’t, Inc., 909 F.2d 747, 753 (3d Cir. 1990). A case out of the First Circuit took yet another position, indicating .that staying on the job while seeking redress is required except in exceptional cases, Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 35 (1st Cir. 2003). One court found such an exceptional case when an employee correctly believed her termination was immi *650 nent. EEOC v. Univ. of Chi. Hosps., 276 F.3d 326, 331-32 (7th Cir. 2002).
One federal court noted the potential tightrope that a plaintiff must show in proving a constructive discharge claim. In Bristoio v. Daily Press, Inc., the Fourth Circuit noted that while an employee must show his working conditions are intolerable, his “desire for reinstatement to his position belies the claim that intolerable conditions underlay his resignation.” 770 F.2d 1251, 1256 (4th Cir. 1985). It is surely true that a requirement an employee remain employed in an intolerable employment environment is a concept in tension with itself.
E. State Caselaw on Constructive Discharge. A number of state courts have expressly considered whether an employer must have a reasonable chance to remedy the situation before a finder of fact may find that an employee was constructively discharged. In Pollock, the court held there was no legal requirement that an employee must complain of harassment and wait and see what happens in all circumstances. 11 S.W.3d at 761. The Pollock court reasoned that a failure to complain may show the employee was not constructively discharged, but not in all cases. Id. at 765. In some cases, according to the court, a failure to complain may indicate that other factors were at play other than the tolerability of the working conditions. Id. The court concluded that courts must consider the totality of the circumstances in determining whether working conditions were, in fact, intolerable. Id. Later Missouri appellate court cases, however, seemed to abandon the Pollock approach in favor of a reasonable-chance-to-resolve requirement. See DeWalt v. Davidson Serv./Air, Inc., 398 S.W.3d 491, 501 (Mo. Ct. App. 2013); Gamber v. Mo. Dep’t of Health & Senior Servs., 225 S.W.3d 470, 475 (Mo. Ct. App. 2007). Other state courts, however, have followed the general approach in Pollock. See, e.g., Charles v. Regents of N.M. State Univ., 150 N.M. 17, 256 P.3d 29, 34-35 (N.M. Ct. App. 2010); Ballinger v. Klamath Pacific Corp., 135 Or.App. 438, 898 P.2d 232, 238 (1995); see also Binkley v. City of Tacoma, 114 Wash.2d 373, 787 P.2d 1366, 1376 (1990).
A final case of interest is Marten Transportation, Ltd. v. Department of Industry, Labor, & Human Relations, 171 Wis.2d 147, 491 N.W.2d 96 (Wis. Ct. App. 1992), rev’d, 176 Wis.2d 1012, 501 N.W.2d 391 (1993). The Wisconsin court, in a case noted by commentators, declared that “requiring a discrimination victim to stay put to mitigate damages [is] like requiring ‘victims’ of legal malpractice to continue being serviced by their negligent lawyer in order to give the lawyer the chance to improve his or her skills.” Id. at 199; see Arthur Young & Co. v. Sutherland, 631 A.2d 354, 362 (D.C. 1993) (explaining that when working conditions are intolerable, an employee need not remain in them and attempt to resolve them in order to recover for constructive discharge); see also Kende, 71 Notre Dame L. Rev. at 53 n.78. The Marten Transportation case, however, was overruled by the Wisconsin Supreme Court in a divided opinion. Marten Transp., Ltd. v. Dep’t of Indus., Labor, & Human Relations, 176 Wis.2d 1012, 501 N.W.2d 391, 399 (1993).
F. Iowa Caselaw on Constructive Discharge. In the pre-Suders case of Van Meter Industrial, we considered constructive discharge under a local human rights ordinance. 675 N.W.2d at 505. We presented a basic outline of the legal parameters of a constructive discharge claim, which appear to have been uncontested. Id. at 510-12. Citing an Eighth Circuit case, we stated that “conditions will not be considered intolerable unless the employer has been given a reasonable chance to resolve *651 the problem.” Id. at 511. But we balanced this observation with the contrapuntal declaration in the next sentence, stating, “On the other hand, an employee need not stay if he or she reasonably believes there is no possibility the employer will respond fairly.” Id. Thus, Van Meter is ambiguous on the question of whether an employee suffering intolerable discrimination must remain on the job while the employer investigates. In any event, Van Meter is not entitled to stare decisis because the parties agreed on the elements of constructive discharge in their briefs before the court. See, e.g., Hemingway, 734 F.3d at 335 (holding a prior case was not precedent on an issue when the issue was not contested); Goldberger, 209 F.3d at 49 (finding certain cases did not support an issue when the issue was not contested by the parties nor addressed by the panel); Fulton Found., 108 N.W.2d at 316-17 (stating a case was not efficacious on an issue which was not challenged by the parties). In any event, it remains to be seen whether this conclusion remains good Iowa law after Suders.
G. Discussion.
1.No requirement of wanting employee to quit. As seen above, the caselaw is divided on the question of whether an employer must desire the employee to quit before a plaintiff may prove constructive discharge. I agree with the majority approach, however, that there is no such subjective legal requirement. I do so for several reasons. The focus on constructive discharge should be on the perceptions of a reasonable employee in light of the remedial purposes of the ICRA. I do not think subjective protestations on the part of the employer should be a defense if the objective evidence demonstrates working conditions would be considered intolerable by a reasonable person in the shoes of the plaintiff. See Ramsey, 907 F.2d at 1010; Watson, 823 F.2d at 361; Alicea Rosado, 562 F.2d at 119.
2. Objective test. In Van Meter, 675 N.W.2d at 511, we stated that the standard was objective and most courts, including the United States Supreme Court in Su-ders, have made similar statements. 542 U.S. at 141, 124 S.Ct. at 2351. And, no party here contests the objective nature of a constructive discharge claim.
Therefore, the suggestion in the instruction that constructive discharge may be shown if the employee subjectively believes conditions are intolerable is not in accord with the law as agreed upon by the parties in this case. Although the instruction was imperfect, taken as a whole, any error was harmless on this point in light of the repeated reference to reasonability throughout the instructions. On retrial, however, the district court might want to eliminate any confusion by consistently referencing the objective nature of the inquiry.
3. Reasonable chance to resolve the problem: Can Faragher-Ellerth jump the track (again)? The last issue is the district court’s refusal to instruct that the “conditions will not be considered intolerable unless the employer has been given a reasonable chance to resolve the problem.” At its core, this is another effort to transplant the thrust of the Faragher-Ellerth affirmative defense outside the context of vicarious liability. See Sara Kagay, Applying the Ellerth Defense to Cmistructive Discharge: An Affirmative Answer, 85 Iowa L. Rev. 1035, 1050-51 (2000). This approach appears to have been embraced by the Eighth and Eleventh Circuits, but not in the Seventh Circuit. Trierweiler, 639 F.3d at 460; Lindale, 145 F.3d at 956; Bozé, 912 F.2d at 805. As seen above, there is state caselaw from Missouri, New Mexico, and Oregon to the contrary. Pollock, 11 *652 S.W.3d at 761, Charles, 256 P.3d at 34-35; Ballinger, 898 P.2d at 238. The caselaw thus presents us with an important interpretive choice.
Based on our review of the possible approaches, I think the better view is not to impose a legal requirement that an employee must give the employer a reasonable period of time to remedy the problem in all constructive discharge cases. As pointed out in the caselaw and in the commentary, this requirement is a Catch-22 in that the plaintiff must prove conditions are so intolerable that any reasonable person would quit, while remaining patiently in the workplace to see if an employer can change its behavior and come up with a remedy. See Gormley v. Coca-Cola Enters., 137 N.M. 192, 109 P.3d 280, 285 (2005) (finding fact that employee gave employer one-month notice before quitting a factor in the employer’s favor in considering summary judgment on constructive discharge claim). In addition, requiring a plaintiff to remain in a situation that is objectively intolerable based upon the employer’s discriminatory conduct has a cynical if not brutal quality. There seems little point to require an employee to stay and fight when the employment relationship has been seriously damaged by discriminatory conduct of the employer. Martha Chamallas, Title VII’s Midlife Crisis: The Case for Constructive Discharge, 77 S. Cal. L. Rev. 307, 372 (2004) [hereinafter Cham-allas].
Empirical sources confirm that very few victims of sexual harassment pursue complaints through internal grievance procedures. Although now somewhat dated, scholarly literature suggests that workers who suffer harassment who utilize internal channels range from 2.5%-12%. See Cham-allas, 77 S. Cal. L. Rev. at 373. Remarkably, even among persons who ultimately sued their employer for workplace harassment, nearly half did not report the harassment and only fifteen percent did so in a timely manner. Id. The question thus arises as to whether a court evaluating reasonable employee behavior in a constructive discharge context should require atypical behavior. See id. And, courts should be cautious in assuming as a matter of law that an assertive approach which judges on an appellate bench with relative job security might think reasonable might not be regarded as reasonable by a jury of lay persons with wide experience in a diverse labor market.
Finally, forcing persons into internal processes tends to privatize civil rights enforcement in an environment where sexual harassment may be considered to be a personal problem for individual women rather than a systemic issue. Id. Internal complaint procedures are thus often unappealing because of a lack of empathy from decision-makers and the perceived risks of retaliation. The end result may be for victims to simply suffer in silence and then quit when conditions get bad. Id. at 379.
I would thus conclude there is no legal requirement to prevail on a hostile environment claim that an employer had an opportunity to resolve the problem. Pollock, 11 S.W.3d at 761; Charles, 256 P.3d at 37; Ballinger, 898 P.2d at 238. That said, the failure of an employee to pursue available remedies with the employer may be evidence for the fact finder to consider in determining whether a work environment was truly so intolerable as to satisfy the requirements of a constructive discharge. See Lindale, 145 F.3d at 955-56; Levendos, 909 F.2d at 1230. It is not, however, dis-positive. Whether conditions were so intolerable that a reasonable person would have no choice but to leave employment is “a heavily fact-driven determination.” Levendos, 909 F.2d at 1230. As a result, the constructive discharge instruction was not *653 flawed because of its failure to require as a matter of law that the plaintiff remain in the intolerably hostile workplace to allow the employer to attempt to remedy the problem.
VIL Conclusion.
For the above reasons, I would generally conclude the approach of the district court comported with Iowa law except with respect to the instruction regarding materially adverse conditions required to support retaliation. For this reason, I too would reverse the judgment of the district court and remand for a new trial.
Wiggins and Hecht, JJ., join this concurrence in part and dissent in part. Cady, C.J., joins in part.

. See, e.g., Arthur E. Bonfield, The Substance of American Fair Employment Practices Legislation I: Employers, 61 Nw. U. L. Rev. 907, 909-10 & n.6 (1967); Elmer A. Carter, Practical Considerations of Anti-Discrimination Legislation—Experience Under the New York Law Against Discrimination, 40 Cornell L.Q. 40, 40 (1954); Richard B. Dyson & Elizabeth D. Dyson, Commission Enforcement of State Laws Against Discrimination: A Comparative Analysis of the Kansas Act, 14 U. Kan. L. Rev. 29, 29-31 (1965); Herbert Hill, Twenty Years of State Fair Employment Practice Commissions: A Critical Analysis with Recommendations, 14 Buff. L. Rev. 22, 22 (1964); Robert G. Meiners, Fair Employment Practices Legislation, 62 Dick. L. Rev. 31, 31 & n.1, 33 (1957); Arnold H. Sutin, The Experience of State Fair Employment Commissions: A Comparative Study, 18 Vand. L. Rev. 965, 965 & n.1 (1965).f

. The because-of causation language in Title VII's discrimination and retaliation provisions is also found in earlier state antidiscrim-ination statutes. See, e.g., Wash. Rev. Code § 49.60.030 (1957) ("The right to be free from discrimination because of race, creed, color, or national origin is recognized as and declared to be a civil right.”); Int’l Bhd. of Elec. Workers Local 35 v. Comm’n on Civil Rights, 140 Conn. 537, 102 A.2d 366, 367 n.1 (1953) (quoting the 1949 Connecticut Fair Employment Practices Act that "[i]t shall be an unfair employment practice ... (c) for a labor organization, because of the race, color, religious creed, national origin or ancestry of any individual to exclude from full membership rights or to expel from its membership such individual or to discriminate in any way against any of its members”).

. The same historical mistake is often made with respect to the Iowa Constitution, which some claim is modeled after the United States Constitution. In fact, the United States Constitution, and every provision of its Bill of Rights, was derived from provisions of state constitutions that existed before 1789, especially the Virginia Declaration of Rights and the Massachusetts Constitution. The documents published in Paris by Benjamin Franklin, hailed to be the first written constitutions, were state constitutions, not the later and largely derivative United States Constitution. See Daniel J. Hulsebosch, The Revolutionary Portfolio: Constitution-Making and the Wider World in the American Revolution, 47 Suffolk U. L. Rev. 759, 802 & n.222 (2014).

. It is sometimes asserted that we should follow federal precedent under Title VII to foster uniformity. When Congress enacted Title VII in 1964, approximately one-half of the states had some kind of antidiscrimination statute. See Susan Elizabeth Powley, Exploring a Second Level of Parity: Suggestions for Developing an Analytical Framework for Forum Selection in Employment Discrimination Litigation, 44 Vand. L. Rev. 641, 667 & n.184 (1991). Congress expressly considered the question of requiring uniformity when it declared that Title VII does not preempt state law. See 42 U.S.C. § 2000h-4; Alexander v, Gardner-Denver Co., 415 U.S. 36, 48-49, 94 S.Ct. 1011, 1019-20, 39 L.Ed.2d 147 (1974) (“[T]he legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes. The clear inference is that Title VII was designed to supplement rather than supplant, existing laws and institutions relating to employment discrimination.”). Further, it is doubtful that uniformity will be advanced by incorporation of federal law. The United States Supreme Court has resolved only a handful of cases in the civil rights area over the years. The literature is full of documentation of various splits in the federal circuits on numerous questions that the Supreme Court has not resolved. The stability of incorporating a handful of Supreme Court precedents is outweighed by dragging into Iowa law the many controversies in the federal caselaw that have not been resolved.

.No one would suggest, for instance, that if Iowa were to adopt a statute modeled after the statute of another state, we would be compelled to follow the interpretations of the supreme court of the other state in interpretation of Iowa law, See Crosby v. Alton Ochsner Med. Found., 276 So.2d 661, 665 (Miss. 1973) (holding that when Mississippi adopted a statute modeled after a Georgia enactment, decisions of the Georgia courts did not bind Mississippi courts in interpretation of the statute).

. For an interesting discussion, see Tyler S. Smith, Note, A Mid-Life Crisis in the Interpretation of the Iowa Civil Rights Act of 1965: How Should State Courts Interpret Original State Antidiscrimination Statutes After Federal Counterpart Statutes Are Amended?, 64 Drake L. Rev. 1117, 1141-49 (2016).

. Such a reaction has been referred to as a "‘Pavlovian response” to federal opinions. Stone v. St. Joseph's Hosp. of Parkersburg, 208 W.Va. 91, 538 S.E.2d 389, 410 (2000) *613 (McGraw, J., concurring in part and dissenting in part).

. Many state civil rights cases have declined to follow federal authorities. See, e.g., Smith v. Anchorage Sch. Dist., 240 P.3d 834, 842 (Alaska 2010) (rejecting Supreme Court but-for test for age discrimination under unified Alaska statute); Reid v. Google, Inc., 50 Cal.4th 512, 113 Cal.Rptr..3d 327, 235 P.3d 988, 991-92 (2010) (departing from “stray remarks” precedent of Supreme Court); Williams v. Dep't of Pub. Safety, 369 P.3d 760, 774 (Colo. 2015) (rejecting Federal Title VII precedent that front pay is an available remedy under Colorado antidiscrimination act); Vollemans v. Town of Wallingford, 103 Conn.App. 188, 928 A.2d 586, 602 (2007) (rejecting the Ricks-Chardon rule for filing requirements in discriminatory discharge cases under Connecticut law), aff'd, 289 Conn. 57, 956 A.2d 579 (2008) (adopting fully the "thoughtful and comprehensive” opinion of the appellate court); Sangamon Cty. Sheriff’s Dep’t v. Ill. Human Rights Comm'n, 233 Ill.2d 125, 330 Ill.Dec. 187, 908 N.E.2d 39, 45-47 (2009) (rejecting Supreme Court precedent in holding employer strictly liable for sexual harassment of a supervisor when supervisor had no • authority to affect terms and-conditions of employment); Loras Coll. v. Iowa Civil Rights Comm’n, 285 N.W.2d 143, 147 (Iowa 1979) ("[W]e are not bound by federal cases construing a federal statute when we are called upon to construe our own Civil Rights Act.”); Ruffin Hotel Corp. of Md. v. Gasper, 418 Md. 594, 17 A.3d 676, 685 (2011) (finding that Title VII precedent “does not comport with Maryland law”); City of New Bedford v. Mass. Comm'n Against Discrimination, 440 Mass. 450, 799 N.E.2d 578, 589 (2003) (noting the differences between Massachusetts disability act and federal counterpart in definition of "major life activity”); Dahill v. Police Dep’t of Boston, 434 Mass. 233, 748 N.E.2d 956 (2001) (rejecting Sutton); Coll. Town, Div. of Interco, Inc. v. Mass. Comm’n Against Discrimination, 400 Mass. 156, 508 N.E.2d 587, 592 (1987) (rejecting Faragher-Ellerth under Massachusetts statute); Chambers v. Trettco, Inc., 463 Mich. 297, 614 N.W.2d 910, 918 (2000) (declining to follow Faragher-Ellerth); Van Den Berk v. Mo. Comm'n on Human Rights, 26 S.W.3d 406, 411 (Mo. Ct. App. 2000) (announcing that Missouri cases will depart from federal civil rights law "where that law is not in accord with the thrust of our state's statute” (quoting Wentz v. Industrial Automation, 847 S.W.2d 877, 879 (Mo. Ct. App, 1992))); Laudertv. Richland Cty. Sheriff’s Dep’t, 301 Mont. 114, 7 P.3d 386, 397 (2000) (rejecting federal definition of prevailing plaintiff because such á reading would not further purpose of Montana Human Rights Act); Alexander v. Seton Hall Univ., 204 N.J. 219, 234-36, 8 A.3d 198 (N.J. 2010) (declining to follow crabbed framework of analysis of statute of limitations under Ledbetter); L.W. ex rel. L.G. v. Toms River Reg’l Sch. Bd. of Educ., 189 N.J. 381, 915 A.2d 535, 549 (2007) (rejecting Title IX deliberate indifference standard in favor of analogous New Jersey precedent); Lehrmann v. Toys ‘R’ Us, Inc., 132 N.J. 587, 626 A.2d 445 (1993) (declining to follow Meritor majority and adopting position of concurrence); Saffos v. Avaya Inc., 419 N.J.Super. 244, 16 A.3d 1076, 1095 (2011) (rejecting Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 130 S.Ct. 1662, 176 L.Ed.2d 494 (2010), observing that New Jersey courts are not reluctant to depart from federal precedent in appropriate circumstances); Bennett v. Health Mgmt. Sys., Inc., 92 A.D.3d 29, 936 N.Y.S.2d 112, 116 (2011) (observing that the New York City civil rights act has "uniquely broad and remedial purposes” which go beyond its state and federal counterparts); Vitale v. Rosina Food Prod., Inc., 283 A.D.2d 141, 727 N.Y.S.2d 215, 217 (2001) (differentiating state from federal sexual harassment law); Coryell v. Bank One Trust Co. N.A., 101 Ohio St.3d 175, 803 N.E.2d 781, 785-86 (2004) (declining to follow federal precedent in age discrimination matter); Allison, 821 P.2d at 35 (departing from federal but-for causation for a retaliation claim under the Washington Human Rights Act); Pulcino v. Fed. Express Corp., 141 Wash.2d 629, 9 P.3d 787 (2000) (departing from federal precedent in defining "disability”); see generally Alex B. Long, Viva State Employment Law! State Law Retaliation Claims in a Posf-Crawford/Burlington Northern World, 77 Tenn. L. Rev, 253, 268-76 (2010); Sperino, Revitalizing, 20 Geo. Mason L. Rev. at 545.

. See Pippen, 854 N.W.2d at 31.

.This dictum is correct as applied to a derivative claim based upon vicarious liability, but it does not apply to a claim based upon direct negligence. When a supervisor participates in the harassment, the plaintiff has a choice.- The plaintiff may proceed directly against the employer under a negligence theory and bear the burden of showing that the employer knew or should have known of the harassment and failed to stop it, or she may proceed under a vicarious liability theory. If the plaintiff proceeds under a vicarious liability theory, then the employer is entitled to the Faragher-Ellerth defense.

. See generally Alex B. Long, “If the Train Should Jump the Track ...Divergent Interpretations of State and Federal Employment Discrimination Statutes, 40 Ga. L. Rev. 469 (2006).

. Although the parties have assumed in our cases that the Faragher-Ellerth defense is available under the ICRA, we have not adjudicated the issue in a contested case. A number of state courts have declined to adopt the Faragher-Ellerth defense under their state civil rights acts, See, e.g., Myrick, 73 F.Supp.2d *623 at 98; Chambers, 614 N.W.2d at 918; Pollock, 11 S.W.3d at 767.

. Womack appears to have been subsequently modified by later cases. See, e.g., Tuttle v. Henry J. Kaiser Co., 921 F.2d 183, 186 n.3 (8th Cir. 1990); Balicao v. Univ. of Minn., 737 F.2d 747, 750 n.2 (8th Cir. 1984).

. See also U.S. Equal Emp’t Opportunity Comm’n, Theories of Discrimination: Intentional and Unintentional Employment Discrimination A-19 (May 1995) (“The retaliation provisions [of the EPA, ADA, and ADEA] provide exceptionally broad protection to individuals who file charges or otherwise aid the EEOC’s enforcement function. It is the EEOC’s policy to expedite the investigation of retaliation charges and seek injunctive relief, since it has the unique interest of preserving the integrity of its investigative process and preventing a chilling effect on the willingness of individuals to protest discriminatory conduct.”).

. Burlington Northern makes it clear that the adverse action might not be employment related and thus the plaintiff in a retaliation case must show "adverse action” rather than "adverse employment action.” See 548 U.S. at 57, 126 S.Ct. at 2408. Nonetheless, I will use the nomenclature used by our pre-Burlington Northern precedents.

. We also cited Farmland Foods for the proposition that materially adverse employment action embraces a wide variety of facts. 672 N.W.2d at 742. Farmland Foods involved a claim of a hostile environment, not a retaliation claim. Id. The substantive standard for establishing a hostile-environment claim is not the same as that for establishing a .retaliation claim. For example, under Title VII, the focus on a hostile-environment claim is “terms and conditions of employment,” while the focus on a retaliation claim is whether the action might well reasonably deter an employee from pursuing a civil rights claim. Burlington Northern, 548 U.S. at 69, 126 S.Ct. at 2415-16, Yet, the application of both standards generally involve, factual inquiries. See McElroy, 637 N.W.2d at 498-500.

. In one study, ninety-five laws students at the University of Cincinnati were surveyed about what kind of job actions would dissuade them from filing a civil rights complaint. See Sperino, Retaliation, 67 Fla. L. Rev. at 2045. In the survey, eighty percent indicated that a negative evaluation either would or might dissuade them from pursuing a potential claim. Id.

. depending on the context, “snubbing” could easily be regarded by a factfinder as something that might well have dissuaded a reasonable worker from making or supporting a charge of discrimination. See B. Glenn George, Revenge, 83 Tul. L. Rev. 439, 443 (2008).